**HERCULES INCORPORATED,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–**
Appellee.

**WM. T. THOMPSON COMPANY,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–**
Appellee.

Nos. 92–5124, 92–5138.

United States Court of Appeals,
Federal Circuit.

May 4, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied and Declined July 7, 1994.

Gregory W. Homer, Atty., Anderson, Kill, Olick & Oshinsky, Washington, DC, argued, for plaintiff-appellant, Hercules Inc. With him on the brief, were Nancy A. Markowitz and Jerold Oshinsky. Of counsel was Walter S. Rowland, Hercules Inc., of Wilmington, DE.

David S. Fishback, Asst. Director, U.S. Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief, were Stuart M. Gerson, Asst. Atty. Gen., J. Patrick Glynn, Director, Torts Branch, Stephen M. Doyle and Burke M. Wong.

Alan Dumoff, Atty., Swankin & Turner, Washington, DC, argued, for plaintiff-appellant, Wm. T. Thompson Co. With him on the brief, was James S. Turner.

Stephen M. Doyle, Atty., U.S. Dept. of Justice, Washington, DC, argued, for defendant-appellee. With him on the brief, were Stuart M. Gerson, Asst. Atty. Gen., J. Patrick Glynn, Director, Torts Branch, David S. Fishback, Asst. Director, and Burke M. Wong.

Before PLAGER, CLEVENGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

In these consolidated appeals, Hercules Incorporated (Hercules) and Wm. T. Thompson Company (Thompson), respectively, appeal the April 2 and April 22, 1992 judgments of the United States Claims Court.[1] In those judgments, the court dismissed Hercules' and Thompson's complaints after granting the motions of the United States for summary judgment.[2] Hercules and Thompson, who are chemical manufacturers, had sought to recover the sums they contributed to a fund established in connection with the settlement of a district court class action tort suit brought against them and other companies by and on behalf of individuals who were exposed to a defoliant known as "Agent Orange" during the Vietnam War. Hercules and Thompson also had sought to recover the attorney fees and expenses incurred in that litigation.[3] Finding no error in the Claims Court's decisions, we affirm the judgments.

---

1. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516, changed the name of the United States Claims Court to the "United States Court of Federal Claims." Unless the context requires otherwise, we refer to the trial court by the name which it had while this matter was pending before it.

2. *Hercules, Inc. v. United States,* 25 Cl.Ct. 616 (1992); *Wm. T. Thompson Co. v. United States,* 26 Cl.Ct. 17 (1992).

3. Throughout this opinion, we will cite to the following four district court decisions in what we refer to as the "Agent Orange litigation":

i. *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 762 (E.D.N.Y.1980) (decision certifying Fed.R.Civ.P. 23(b)(3) class of plaintiffs);
ii. *In re "Agent Orange" Prod. Liab. Litig.,* 565 F.Supp. 1263 (E.D.N.Y.1983) (decision granting summary judgment in favor of defendant chemical manufacturers—subsequently reconsidered after the case was transferred to another district judge);
iii. *In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. 740 (E.D.N.Y.1984) (decision approving settlement agreement between class action plaintiffs and defendant chemical manufacturers); and
iv. *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223 (E.D.N.Y.1985) (decision grant-

BACKGROUND

The following facts are not in dispute:

## A. Historical

In the mid to late 1960s, Hercules and Thompson were members of a group of chemical companies that manufactured Agent Orange for the United States military. Agent Orange is a blend of equal parts of 2,4–Dichlorophenoxyacetic Acid (2,4–D) and 2,4,5–Trichlorophenoxyacetic Acid (2,4,5–T), both of which are phenoxy herbicides. *Hercules, Inc. v. United States*, 25 Cl.Ct. 616, 618 (1992). Depending on its method of production, Agent Orange may contain varying amounts of 2,3,7,8 Tetrachlorodibenzo-p-dioxin (dioxin), an extremely toxic substance. *Id.* The military used Agent Orange during the Vietnam War to defoliate large areas of forest so that Viet Cong and North Vietnamese troops could not hide beneath the foliage from view of aircraft. The military mixed the Agent Orange produced by the various chemical companies and stored the mixture in large drums. *Id.* at 619. During the relevant period, the government and the military had considerable knowledge of hazards associated with 2,4,5–T and dioxin. *In re "Agent Orange" Prod. Liab. Litig.*, 565 F.Supp. 1263, 1266 (E.D.N.Y.1983).

Hercules began producing phenoxy herbicides containing 2,4,5–T in 1961. *Hercules*, 25 Cl.Ct. at 619. It produced Agent Orange for the government between May 8, 1964, and May 20, 1968, pursuant to fifteen separate contracts. *Id.* The military supplied the formula and specifications for manufacturing Agent Orange, with which Hercules complied. *Id.* In its complaint in the Claims Court, Hercules alleged that it manufactured and supplied Agent Orange pursuant to the Defense Production Act of 1950, 50 U.S.C. app. § 2061–2170 (1964) (hereinafter, DPA).[4] In 1965, Hercules learned of the health risks associated with 2,4,5–T and changed its method of production to eliminate dioxin from its product. *Id.; In re "Agent Orange",*

565 F.Supp. at 1274. From 1966 to 1970, Hercules' product was not measurably contaminated with dioxin. *Id.*

Thompson produced phenoxy herbicides containing 2,4,5–T and 2,4–D in the 1950s and 1960s. Thompson, however, originally declined to bid on the government's solicitation to chemical manufacturers for the production of Agent Orange. *Wm. T. Thompson Co. v. United States*, 26 Cl.Ct. 17, 20 (1992). In due course, however, the government invoked the DPA and required Thompson to supply Agent Orange pursuant to two contracts dated April 19, 1967, and May 24, 1968. *In re "Agent Orange"*, 565 F.Supp. at 1272. Between September 1967 and January 1969, Thompson supplied Agent Orange to the military. *Id.* There is no evidence that Thompson was aware of the health risks associated with Agent Orange. *Id.* at 1273. As in the case of Hercules, the government provided the formula and specifications for Agent Orange without any input from Thompson.

## B. The Agent Orange Litigation

Starting in 1979, numerous tort actions were filed by Vietnam veterans and their families against the various chemical manufacturers who produced Agent Orange for the government, including Hercules and Thompson. The tort actions alleged that the veterans' exposure to dioxin contained in Agent Orange produced by the chemical companies had caused various health problems for the plaintiffs, such as cancer, miscarriages, and birth defects. The Judicial Panel on Multi–District Litigation consolidated these tort actions in the United States District Court for the Eastern District of New York, under the heading MDL No. 381. The court certified a class comprising all veterans claiming injuries who had served in or near Vietnam between 1961 and 1972, pursuant to Fed.R.Civ.P. 23(b)(3). The certified class also included the veterans' spouses,

---

ing summary judgment in favor of defendant chemical manufacturers against plaintiffs who had opted-out of the class action).

4. The DPA authorizes the President, *inter alia,* to require acceptance and performance of contracts

which he deems necessary or appropriate to promote the national defense in preference to other contracts. 50 U.S.C. app. § 2071. The pertinent parts of the statute are discussed below.

parents, and children (born before January 1, 1984) directly or derivatively injured as a result of the veterans' exposure. *In re "Agent Orange" Prod. Liab. Litig.*, 506 F.Supp. 762, 787–92 (E.D.N.Y.1980). Plaintiffs were allowed to "opt out" of the Rule 23(b)(3) class by May 1, 1984. *Id.* As discussed below, nearly 300 of the plaintiffs opted out.

Hercules and Thompson, along with several other defendant manufacturers, moved for summary judgment in the district court on the ground that, because of their status as government contractors, the government contractor defense shielded them from liability for any injuries to the veterans or their families allegedly caused by exposure to Agent Orange. *In re "Agent Orange"*, 565 F.Supp. at 1265.[5] In a previous pretrial order, the district court had defined the contours of the government contractor defense as follows:

> [A] defendant in this case will be entitled to judgment dismissing all claims against it based on that defendant's having supplied "Agent Orange" to the government pursuant to a contract, if the defendant proves:
>
> 1. That the government established the specifications for "Agent Orange";
>
> 2. That the "Agent Orange" manufactured by the defendant met the government's specifications in all material respects; and
>
> 3. That the government knew as much or more than the defendant about the hazards to people that accompanied use of "Agent Orange."

*Id.* (quoting *In re "Agent Orange" Prod. Liab.*, 534 F.Supp. 1046, 1055 (E.D.N.Y. 1982)).

On May 20, 1983, the district court granted summary judgment for Hercules and Thompson, along with two other manufacturers of Agent Orange, finding that they met the requirements of the "government contract defense." *Id.* at 1273, 1274. In so ruling, the district court framed the "central issue" as whether the third element of the government contractor defense had been established, i.e., "whether the government knew as

much as or more than the contracting defendant about the hazards to people that accompanied the use of 'Agent Orange.'" *Id.* at 1265.

With respect to Hercules, the district court concluded that because its "product was dioxin-free, Hercules had no knowledge of harm from dioxin contamination caused by its product and thus did not know more than the government about hazards associated with the use of its product." *Id.* at 1274.

In Thompson's case, the district court concluded that although the evidence established that Thompson may have had "knowledge of possible health hazards related to the *manufacture* of Agent Orange[, the evidence did not establish] knowledge in Thompson of hazards to *users.*" *Id.* at 1273 (emphasis supplied). In contrast, the district court believed that "it [was] clear by 1967, when Thompson first contracted to manufacture Agent Orange, the government had a significant amount of knowledge about dioxin ... and its association with ... health problems." *Id.*

Hercules' and Thompson's victory in the district court proved to be short-lived, however. After summary judgment was entered in their favor and in favor of the other two Agent Orange manufacturers—but before a judgment of dismissal was entered—the case was transferred to another judge in the Eastern District of New York. In November of 1983, the transferee judge reconsidered the issue and denied the summary judgment motions of Hercules and Thompson. *See In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740, 753 (E.D.N.Y.1984).

On May 7, 1984, the date that trial would have begun in the class action suit, the parties reached a settlement. The settlement called for the creation of a $180 million settlement fund, with each defendant contributing to the fund in proportion to its percentage of the total volume of Agent Orange produced, with a factor for the level of dioxin in the particular manufacturer's product. *In re "Agent Orange"*, 597 F.Supp. at 748. Hercules' share of the settlement was about ten percent, valued at $18,772,568. Thompson's

---

**5.** The district court used the term "government    contract defense." *Id.*

share was around two percent, amounting to $3,096,597. In its opinion approving the settlement, the district court noted that the plaintiffs would have had extreme difficulty proving that their injuries resulted from exposure to dioxin present in the Agent Orange. *In re "Agent Orange"*, 597 F.Supp. at 782.

Upon settlement of the class action, the defendant manufacturers, including Hercules and Thompson, moved for summary judgment against the nearly 300 plaintiffs who had opted-out of the class action suit. These opt-out plaintiffs were those who had voluntarily chosen not to be part of the certified Rule 23(b)(3) class, and who consequently did not share in the $180 million settlement fund. In support of the summary judgment motion, the defendant manufacturers argued that they were entitled to judgment

> because of each plaintiff's conceded inability to identify the individual manufacturer of the Agent Orange to which a given veteran was exposed, inapplicability of any alternative theory of liability that would overcome that inability, the government contract defense, and inability of any plaintiff to prove that his or her injuries were caused by Agent Orange.

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1229 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). The district court granted summary judgment for the manufacturers primarily on the ground that the plaintiffs had failed to present credible evidence of a causal link between exposure to Agent Orange and the plaintiffs' alleged injuries. *Id.* at 1259–60. As a secondary basis, the district court held that the defendant companies were insulated from liability by the government contractor defense as it was "clear from the record ... that the government knew as much as, or more than, the defendant chemical companies about the possible adverse health effects of Agent Orange as it was used in Vietnam." *Id.* at 1263. This secondary ground for summary judgment was identical, of course, to the ground upon which summary judgment had been granted in favor of Hercules and

Thompson two years earlier, before the case was transferred.

The United States Court of Appeals for the Second Circuit affirmed both the settlement with the Rule 23(b)(3) class, *In re "Agent Orange" Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145 (2d Cir.1987), and the grant of summary judgment in favor of the defendant manufacturers against the opt-out plaintiffs. *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). The Court of Appeals affirmed the grant of summary judgment against the opt-out plaintiffs solely on the basis of the government contractor defense (referred to as the "military contractor defense" by the Second Circuit), and did not address the other grounds for summary judgment advanced by the district court. *Id.* at 189.

## C. The Claims Court Proceedings

In 1990, Hercules and Thompson each brought an action in the Claims Court against the United States, seeking (i) indemnification for their respective contributions to the settlement fund in the 1984 class action settlement, and (ii) legal fees and expenses incurred in the Agent Orange litigation. *Hercules*, 25 Cl.Ct. at 620. The actions were grounded in Hercules' and Thompson's respective contracts with the government for the production of Agent Orange.

Hercules' complaint, filed June 8, 1990, asserted that it was entitled to recover from the government under any one of the following four theories:

1. *Superior Knowledge*—The government allegedly breached an implied-in-fact contractual obligation by withholding from Hercules the government's superior knowledge concerning the unprecedented military use of Agent Orange by the government and the possible health risks attendant with such use.

2. *Good Faith*—The government allegedly breached an implied-in-fact contractual obligation to exercise good faith and not increase Hercules['] costs by using Agent Orange in Southeast Asia in an unprecedent-

ed military manner that failed to avoid potential health risks.

3. *"Reverse" Warranty*—The government allegedly breached an implied-in-fact contractual obligation to exercise due care in using Hercules' Agent Orange. Specifically, Hercules alleged that the government had a duty to use the Agent Orange it purchased from Hercules in a manner reasonably calculated to avoid potential health risks and to take adequate precautions and safeguards or provide identification of active ingredients and adequate warnings and instructions concerning the proper use of and exposure to Agent Orange.

4. *Implied Warranty of Specifications*— The government allegedly breached an implied-in-fact contractual obligation to establish specifications and requirements for Agent Orange sufficient to make Agent Orange adequate and suitable for the unprecedented intended and actual military use to which it was put in Southeast Asia.

Under each of its different theories of liability, Hercules alleged that the government's breach of its contractual obligations caused Hercules to sustain increased expenses of performance and incur substantial money damages in connection with the Agent Orange cases and that Hercules was entitled to contractual indemnification therefor.

Thompson's complaint, filed May 7, 1990, and amended October 23, 1990, asserted that it was entitled to recover against the government under any one of three contractual theories, two of which were substantially identical to two of Hercules' theories of liability: superior knowledge by the government, and an implied warranty of specifications. As a third alternative theory of liability, Thompson contended that the government breached an implied-in-fact contractual obligation to indemnify Thompson for losses arising from its compelled production of Agent Orange under the DPA.

In each case the government moved to dismiss the complaint, or, in the alternative, for summary judgment as a matter of law. *Hercules*, 25 Cl.Ct. at 620; *Wm. T. Thompson*, 26 Cl.Ct. at 22. The Claims Court granted the government's motions for summary judgment and dismissed both cases. In so ruling, the court held that the superior knowledge doctrine only applied in situations where the government possessed vital knowledge that affected contract "performance costs or duration of performance." *Hercules*, 25 Cl.Ct. at 623; *Wm. T. Thompson*, 26 Cl.Ct. at 24. Because Hercules' and Thompson's increased costs were the result of postperformance litigation and were not connected to contract performance, the Claims Court concluded, the superior knowledge doctrine could not be expanded to encompass their claims. *Id.* Similarly, the Claims Court found that Hercules' good faith theory could not withstand summary judgment because it was "another performance-related doctrine" that could not be extended to matters occurring "at some distant point in the future" after contract performance. *Hercules*, 25 Cl. Ct. at 623.

With regard to Hercules' reverse warranty argument, the Claims Court held that such an implied-in-fact reverse warranty never arose because the circumstances surrounding the sale of Agent Orange could not support a factual inference that Hercules and the government had "actually come to a meeting of the minds and taken upon themselves [the] corresponding obligations and liabilities" of the alleged reverse warranty. *Hercules*, 25 Cl.Ct. at 624.

Turning to the warranty of specifications theory, the Claims Court held that even assuming that such a warranty arose, the plaintiff-manufacturers had failed to prove "that this warranty was *breached* by the Government and that this breach caused [them] to suffer the type of damages recoverable in contract." *Hercules*, 25 Cl.Ct. at 625–26; *Wm. T. Thompson*, 26 Cl.Ct. at 25. Addressing first the portion of the damages claim which consisted of the payments into the settlement fund, the court set forth two separate reasons that it believed prevented Hercules and Thompson from proving that they were "actually subjected to tort liability by third parties because of [their] manufacture of Agent Orange for the Government's military use." *Hercules*, 25 Cl.Ct. at 626; *Wm. T. Thompson*, 26 Cl.Ct. at 26. "First," the Claims Court stated, "dioxin has never been

scientifically proven to cause the injuries that the veterans alleged, and second, the [plaintiff-manufacturers were] protected from liability to the veterans in any event under the Government contractor defense...." *Id.*

Regarding the type of damages sought, the Claims Court, citing *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854), and *Northern Helex Co. v. United States,* 524 F.2d 707, 721, 207 Ct.Cl. 862 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976), stated that "it is axiomatic that ... damages [arising from contract breaches] are limited to those that were reasonably foreseeable at the time the parties formed the contract." *Hercules,* 25 Cl.Ct. at 627–28; *Wm. T. Thompson,* 26 Cl.Ct. at 27–28.

From this proposition, the court reasoned that

[t]he facts may support an implied warranty of specification, but they cannot be stretched so far as to support the theory that the parties came to a meeting of the minds that there would be an indemnification agreement between them if the implied warranty of specification was alleged, but never proven, to be violated.

*Hercules,* 25 Cl.Ct. at 627; *Wm. T. Thompson,* 26 Cl.Ct. at 28.

The Claims Court also held that

there was no breach of the warranty of specification based on the manufacturer's tort liability to third parties supposedly injured by the product because the manufacturer, under the circumstances alleged, was protected from liability by the Government contractor defense.

*Hercules,* 25 Cl.Ct. at 628; *Wm. T. Thompson,* 26 Cl.Ct. at 28. We read this latter statement as a holding by the Claims Court that, assuming the existence of an implied warranty of specifications, Hercules and

Thompson could not establish that the damages which they incurred—their payments into the Agent Orange settlement fund—flowed from a breach of that warranty, because the government contractor defense protected them against those damages and they incurred those damages as a result of their decision to settle the litigation in the face of that protection.

As far as the claims for attorney's fees were concerned, the Claims Court held that Hercules and Thompson could not recover such fees because they represented the kind of remote and consequential damages not normally awarded in contract cases. *Hercules,* 25 Cl.Ct. at 627–28; *Wm. T. Thompson,* 26 Cl.Ct. at 27–28, both citing *Kania v. United States,* 650 F.2d 264, 269, 227 Ct.Cl. 458, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981).

In the case of Hercules' and Thompson's assertions that they were entitled to contract indemnification, the Claims Court noted that their respective contracts contained no provision expressly providing for indemnification. *Hercules,* 25 Cl.Ct. at 633; *Wm. T. Thompson,* 26 Cl.Ct. at 28. In Thompson's case, the court rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA,[6] because that section merely "excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA." *Wm. T. Thompson,* 26 Cl.Ct. at 29. In addition, in the case of both Hercules and Thompson, the court held that, even assuming that an implied-in-fact contractual obligation to indemnify existed, the provision would be unenforceable as violative of the Anti–Deficiency Act, 31 U.S.C. § 1341 (1988).[7] *Hercules,* 25

6. In pertinent part, section 707 of the DPA states:
No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act....
50 U.S.C. app. § 2157 (1964).

7. In pertinent part, the Anti–Deficiency Act states that officers or employees of the United States may not:

(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or
(B) involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.
31 U.S.C. § 1341 (1988).

Cl.Ct. at 634; *Wm. T. Thompson,* 26 Cl.Ct. at 29.

Finally, the Claims Court held that the policies underlying the government contractor defense provided a "separate and independent" basis for denial of all claims against the government by Hercules and Thompson. *Hercules,* 25 Cl.Ct. at 631; *Wm. T. Thompson,* 26 Cl.Ct. at 33.

## DISCUSSION

### A. Standard of Review

■■■ A trial court may award summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); RUSCC 56(c); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). In reviewing a grant of summary judgment by the trial court, we determine for ourselves whether the standards for summary judgment have been met and we are not bound by the trial court's ruling that there are no genuine issues of material fact in the case. *Id.*

### B. Appellants' Contentions

On appeal, Hercules contends that because disputed issues of material fact exist, the Claims Court committed reversible error by granting summary judgment with respect to its contractual claims based upon the theories of superior knowledge, reverse warranty, and an implied warranty of specifications. Thompson also contends that the existence of disputed material facts precluded summary judgment with respect to its contractual claims based upon the theories of superior knowledge and an implied warranty of specifications. Thompson further contends that the Claims Court erred as a matter of law in holding (i) that an implied-in-fact contractual obligation for indemnity did not arise under the DPA, and (ii) that such a term—assuming it did arise—would be barred by the Anti–Deficiency Act. Lastly, both Hercules and Thompson contend that the Claims Court erred in holding that the government contractor defense provided a "separate and independent" basis for denial of their claims.

We have carefully considered all of appellants' arguments on appeal. Having found no errors of law, nor any genuine issues of material fact, we conclude that the Claims Court correctly decided each of the contract based claims asserted by Hercules and Thompson. We affirm the judgments of the Claims Court on that basis and do not reach the issue of whether the government contractor defense would provide a "separate and independent" basis for the court's decision. As will be seen, however, the presence of the government contractor defense is dispositive of two of the contract based claims asserted on appeal. We consider below each of the contract based claims.

### C. Analysis

#### 1. Superior Knowledge

■■■ Hercules and Thompson each argue that because the government had superior knowledge of the dangers associated with dioxin, it had a contractual obligation to inform them of such dangers. Because the government failed to do so, they contend, the government breached its contractual obligation.

> The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*American Ship Bldg. Co. v. United States,* 654 F.2d 75, 79, 228 Ct.Cl. 220 (1981). Thus, a claim under the doctrine of superior knowledge is tenable where the government fails to provide a contractor with vital knowledge in the government's possession which bears upon the costs of the contractor's performance under the contract at issue. That was not the case here.

Hercules and Thompson each argue that summary judgment on this point was improperly granted because disputed factual

issues remain concerning whether the type of damages they suffered were "foreseeable" within the meaning of *Hadley v. Baxendale.* Hercules further argues that a disputed factual issue exists regarding the relative levels of knowledge about the hazards of Agent Orange. These alleged disputed issues, however, are immaterial to our decision. Even assuming, *arguendo,* that (i) Hercules' and Thompson's damages were foreseeable, and (ii) the government had superior knowledge of the hazards associated with dioxin, such foreseeability and knowledge had no bearing on Hercules' and Thompson's performance under the contract—i.e., production costs or manufacturing times. Put another way, nothing the government did or failed to do had any impact upon Hercules' and Thompson's production of Agent Orange. As the Claims Court noted, the cases cited for the superior knowledge doctrine concern the withholding of superior knowledge that makes it more difficult to perform under the terms of the contract at issue. *Hercules,* 25 Cl.Ct. at 622–23; *Wm. T. Thompson,* 26 Cl. Ct. at 22–23. *See, e.g., Helene Curtis Indus., Inc. v. United States,* 312 F.2d 774 (Ct.Cl. 1963). We decline to accept Hercules' and Thompson's invitation to extend the doctrine of superior knowledge to encompass their claims for post-performance settlement and litigation expenses, because those expenses were not incurred during the performance of the underlying contracts.

### 2. *The Implied Warranty of Specifications*

■ Both Hercules and Thompson argue for recovery based upon a theory of an implied warranty of specifications, as set forth in *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), and its progeny. *Spearin* stands for the proposition that when the government includes detailed specifications in a contract, it impliedly warrants that (i) if the contractor follows those specifications, the resultant product will not be defective or unsafe, and (ii) if the resultant product proves defective or unsafe, the contractor will not be liable for the consequences. *Spearin,* 248 U.S. at 136–37, 39 S.Ct. at 61. As with any contract-based claim, however, to recover for a breach of

warranty, a plaintiff must allege and prove (1) that a valid warranty existed, (2) the warranty was breached, and (3) plaintiff's damages were caused by the breach. *San Carlos Irrig. and Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.1989); *accord Wunderlich Contracting Co. v. United States,* 351 F.2d 956, 968, 173 Ct.Cl. 180 (1965) (stating that a plaintiff asserting a claim for breach of an implied warranty of specifications has the "burden of establishing the fundamental facts of liability, causation, and resultant injury."). Unlike the superior knowledge doctrine, discussed above, the implied warranty of specifications covers problems arising after performance of the underlying contract. *See Poorvu v. United States,* 420 F.2d 993, 190 Ct.Cl. 640 (1970).

In the present case, Hercules and Thompson argue that because the government supplied the specifications and formula for Agent Orange, the government is liable for their injuries by reason of the breach of an implied warranty of specifications, even though the alleged harm (i.e., costs incurred in the Agent Orange litigation) occurred several years after completion of the Agent Orange production contracts. Both Hercules and Thompson contend that summary judgment was improperly granted because various factual issues remain in dispute with regard to their claims, including (i) whether an implied warranty arose out of the contracts, (ii) whether the type of damages sought were "reasonably foreseeable" at the time the contracts were formed, (iii) whether, leaving aside the government contractor defense, Hercules and Thompson faced potential liability in the Agent Orange litigation, (iv) whether the government knew that Hercules and Thompson faced potential liability, (v) whether the government's defective specifications gave rise to their alleged potential liability, and (vi) whether the class action settlement constituted reasonable conduct in light of the potential liability.

■ We need not, however, resolve the above factual issues because a necessary element of appellants' breach of warranty claims—i.e., causation—is lacking. As noted above, to make out a *prima facie* case of breach of an implied warranty of specifica-

tions, Hercules and Thompson must show not only that the facts support an implied warranty, but also that the warranty was breached and that their damages were caused by the breach. *San Carlos,* 877 F.2d at 959. As seen above, as far as damages to the extent of contributions to the Agent Orange settlement fund are concerned, the Claims Court held that Hercules' and Thompson's claims failed because (i) the absence of scientific evidence regarding the consequences of dioxin exposure precluded a finding that the warranty was breached, (ii) even assuming the existence of an implied warranty of specifications, the warranty would not include the kind of indemnity sought here, and (iii) the availability of the government contractor defense precluded a finding that their damages were caused by the alleged breach. *Hercules,* 25 Cl.Ct. at 626–28; *Wm. T. Thompson,* 26 Cl.Ct. at 26–28. We agree with the Claims Court that the record from the Agent Orange litigation is sparse with respect to scientific proof that the veterans' injuries were caused by dioxin. We also agree with the Claims Court that the facts would have to be stretched to support the theory that, under an implied warranty of specifications, Hercules and Thompson would be entitled to recover from the government their contributions to the Agent Orange settlement fund.[8]

However, we prefer to rest our decision on the third ground articulated by the court: Hercules and Thompson cannot prove that their damages were caused by the government's alleged breach of an implied warranty of specifications because they were protected from liability to the Agent Orange plaintiffs by the government contractor defense.

The Supreme Court explained the government contractor defense in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In *Boyle,* a serviceman was killed during a training exercise due to an alleged design defect in his aircraft. Boyle's personal representative (Boyle) brought a diversity action in federal district court against the government contractor that had manufactured the aircraft, but did not sue the government. Boyle alleged, *inter alia,* under Virginia tort law, that the contractor had defectively designed the aircraft's emergency escape-hatch system. The contractor contended that it had manufactured the escape-hatch system in accordance with government-supplied specifications as required by the contract, and therefore was not liable to Boyle. The jury returned a general verdict for Boyle, and the district court denied the contractor's motion for judgment notwithstanding the verdict.

8. This view is based on the rationale underlying the Supreme Court's decisions in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and *Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). In *Feres,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Supreme Court held that the United States may not be sued in tort for injuries incurred by a serviceperson while on active duty. The Supreme Court had occasion in *Stencel Aero* to explicate the *Feres* decision in the context of service-related injuries allegedly caused by the actions of a government contractor. In *Stencel Aero,* an injured serviceman sued the manufacturer of his malfunctioning fighter plane on a product liability theory. Stencel Aero Engineering Corp. (Stencel Aero), the manufacturer, cross-claimed against the government for indemnity, claiming that any malfunction of its product was caused by defective, government-supplied specifications and components. Holding that the considerations relevant in *Feres* controlled the outcome of the case before it, the Supreme Court upheld the district court's grant of summary judgment for both the government and Stencel Aero against the serviceman, as well as the dismissal of Stencel Aero's cross-claim

against the government. The Court reasoned that to allow an injured serviceperson to circumvent the *Feres* doctrine by suing a government contractor, who would then sue the government for indemnity, would have the same deleterious results as allowing tort suits directly against the government in the military context. *Stencel Aero,* 431 U.S. at 673, 97 S.Ct. at 2058. Thus, the Supreme Court determined that "[t]o permit [the serviceperson] to proceed . . . here would be to judicially admit at the back door that which has been legislatively turned away at the front door." *Id.* (citations omitted).

Neither Hercules nor Thompson has asserted that any provisions of their respective contracts support the argument that the government agreed to indemnify them for third party tort claims. Absent any express provision, such an agreement to indemnify would have to be implied-in-fact. *See Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 714–15 (Fed.Cir.1988). In view of the *Feres–Stencel Aero* doctrine, it is difficult to envision the circumstances under which a court could find an implied-in-fact agreement on the part of the government to provide the kind of indemnity for which Hercules and Thompson argue.

The United States Court of Appeals for the Fourth Circuit reversed and remanded with directions that judgment be entered for the contractor. The Fourth Circuit found, as a matter of federal law, that the contractor could not be held liable for the allegedly defective design because it had satisfied the requirements of the government contractor defense.

The Supreme Court granted certiorari, and held that where a government contractor has satisfied the requirements of the government contractor defense, as set forth in the *Boyle* opinion, the contractor cannot be held liable under state tort law, because to allow liability would frustrate specific objectives of federal legislation. Although Boyle's claim was asserted on the basis of state law, the Supreme Court concluded that "the Federal Government's interest in the procurement of equipment is implicated by suits such as the present one—even though the dispute is one between private parties." *Boyle*, 487 U.S. at 506, 108 S.Ct. at 2515.[9] In cases where the government's interest is implicated, the Supreme Court continued, federal law will displace state law if there is a significant conflict between a federal policy and the operation of state law. *Id.* at 507, 108 S.Ct. at 2515. Looking to the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1988) (hereinafter, FTCA)[10], the Court reasoned that such a significant conflict was present under the circumstances, because to allow Boyle's suit against the contractor would constitute judicial second-guessing of decisions that Congress intended to be within the discretion of the U.S. military. *Id.* at 511, 108 S.Ct. at 2518.[11] To further define the contours of the government contractor defense, the Supreme Court in *Boyle* set forth the following three-part test:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518. A contractor who satisfies this test is immune to tort liability under state law for defects in products manufactured for the government in

**9.** The Court explained:
> The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.

*Boyle*, 487 U.S. at 507, 108 S.Ct. at 2515–16.

**10.** In relevant part, the discretionary function exception to the FTCA states that the limited waiver of sovereign immunity in the FTCA does *not* extend to
> [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1988).

**11.** The Court stated:
> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social consider-

ations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments, see *United States v. Varig Airlines*, 467 U.S. 797, 814 [104 S.Ct. 2755, 2764, 81 L.Ed.2d 660] (1984), through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. To put the point differently: It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.

*Boyle*, 487 U.S. at 511–12, 108 S.Ct. at 2518 (footnote omitted).

accordance with government-supplied specifications.

As seen above, prior to *Boyle*, the district court and the Second Circuit each concluded that the government contractor defense operated to shield Hercules and Thompson. *See In re "Agent Orange"*, 565 F.Supp. at 1273–74 (1983 decision initially granting summary judgment in favor of Hercules and Thompson and two other Agent Orange manufacturers); *In re "Agent Orange"*, 611 F.Supp. at 1263 (1985 decision granting all the manufacturers summary judgment against the opt-out plaintiffs following the Agent Orange litigation settlement); and *In re "Agent Orange"*, 818 F.2d at 189 (1987 court of appeals decision affirming summary judgment against the opt-out plaintiffs). Thus, Hercules and Thompson successfully argued on three separate occasions that the government contractor defense shielded them from liability for the veterans' tort claims. Consequently, there can be no serious doubt that had the class action Agent Orange litigation proceeded to termination, no liability would have been imposed against Hercules or Thompson.

Because the government contractor defense provided a complete defense to the veterans' tort claims, it cannot be said that the damages asserted by Hercules and Thompson were caused by the government, as the Claims Court recognized. As far as their contributions to the settlement fund are concerned ($18,772,568 in the case of Hercules and $3,096,597 in the case of Thompson), it was appellants' voluntary decision to enter into the settlement that led to those damages. The government did nothing to encourage or compel Hercules and Thompson to settle. It was appellants' decision to forego litigating the issue of the government contractor defense to completion that caused them to incur the monetary injury of the contribution to the settlement fund.

■ Based upon the theory of an implied warranty of specifications, Hercules and Thompson also contend that they are entitled to recover the attorney's fees which they incurred in the Agent Orange litigation. As seen above, in rejecting this element of appellants' claims, the Claims Court relied upon *Kania v. United States*, 650 F.2d at 269. In that case, Eugene Kania brought an action in one of this court's predecessors, the Court of Claims, in which he alleged that the government had breached a contract pursuant to which it had agreed not to prosecute him in return for his testimony before a federal grand jury. After he testified in the grand jury, Kania was indicted for various offenses. He was successful, however, in his efforts to have the indictment dismissed, based upon his purported agreement with the government. After the dismissal, he sued in the Court of Claims seeking to recover the expenses incurred in defending against the government's charges. The Court of Claims held that it was without jurisdiction because, whatever arrangement existed between Kania and the government, "there was no contract sufficient to satisfy this court's jurisdictional requirements." *Kania*, 650 F.2d at 269. The court then went on to state:

> Should this be in error, we must now add that jurisdiction to award counsel fees and other litigation expenses as an element of breach damages would be extremely dubious. It is the kind of consequential damages not normally awarded in contract breach cases. *William Green Construction Co. v. United States*, 201 Ct.Cl. 616, 477 F.2d 930 (1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974). Courts do not, in awarding breach damages, follow through the remote indirect consequences of the breach as distinguished from those directly in contemplation when the contract was made. *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).

In light of *Kania*, even assuming the existence of an implied warranty of specifications in this case, such a warranty could not be construed to encompass a warranty by the government that Hercules and Thompson would not have to pay to defend themselves against tort claims that lacked merit because a legal doctrine, such as the government contractor defense, provided a defense to them. In the Claims Court, Hercules and Thompson alleged no facts suggesting that such a warranty—which would have to exist

in order for Hercules and Thompson to recover their attorney's fees from the Agent Orange litigation—was "directly in contemplation" when Hercules and Thompson entered into their respective contracts with the government. *Kania*, 650 F.2d at 269.

### 3. *Reverse Warranty*

██ Hercules argues that the government had an implied-in-fact contractual obligation to use the Agent Orange produced by it in a manner so as to avoid both potential risks to servicemen and the subsequent tort suits against appellants. A material issue of fact exists, Hercules asserts, as to whether this obligation arose when the government ordered Hercules to package Agent Orange in drums marked only with an orange band, thus precluding Hercules from applying the extensive warnings and instructions normally placed on its commercial herbicides. According to Hercules, because it was not permitted to place adequate warnings on the Agent Orange containers, the government thereby warranted to Hercules that the government's use of the product would take into account the absence of warnings and instructions designed to assure the product's safe use. Alternatively, Hercules asserts that a material issue of fact exists as to whether the government's mixing of Hercules' dioxin-free Agent Orange with dioxin-tainted Agent Orange imposed potential liability on Hercules that otherwise would not have existed. In so mixing, Hercules argues, the government assumed obligations that properly include compensating it for liabilities incurred as a result of such conduct. Hercules further contends that courts have recognized the existence of an implied-in-fact warranty running from the purchaser to the seller where the purchaser has engaged in conduct which warrants the imposition of a duty to exercise due care in using a seller's product. The Claims Court characterized Hercules' claim as being based on a "reverse warranty" theory. *Hercules*, 25 Cl.Ct. at 624.

Irrespective of the name used to identify the theory advanced by Hercules, we rejected a similar claim in *Lopez v. A.C. & S., Inc.*, 858 F.2d 712 (Fed.Cir.1988), *aff'g*, 649

F.Supp. 149 (W.D.Wash.1986). In *Lopez*, a civilian employee exposed to asbestos at a naval shipyard brought an action in the United States District Court for the Western District of Washington against several manufacturers who had supplied the asbestos pursuant to a government contract. Upon settling the employee's claim, the asbestos manufacturers filed third-party complaints in the district court, based in part on the Little Tucker Act, 28 U.S.C. § 1346, seeking to recover their settlement payments and litigation expenses from the government. The manufacturers' Tucker Act claims were based on the theory that in specifying asbestos, the government impliedly warranted to the asbestos manufacturers that its use of their product would not expose the manufacturers to unforeseen defective product liabilities to persons who might be injured by exposure to the asbestos. *Lopez*, 858 F.2d at 714. In dismissing the Tucker Act claims, the district court held that such claims were barred by operation of the Anti–Deficiency Act, 31 U.S.C. § 1341. *Lopez*, 649 F.Supp. at 159. As an alternative basis, the district court dismissed the manufacturers' claims for lack of jurisdiction, noting that jurisdiction under the Tucker Act extends only to claims arising out of express or implied-in-fact contracts, and not to claims arising out of implied-in-law contracts. *Id.* The district court concluded that no express contract term existed and that, as a matter of law, the vendor/vendee relationship between the manufacturers and the government, standing alone, did not create an implied-in-fact agreement by the government to indemnify the manufacturers for injuries resulting from the use of the asbestos purchased under the contract. *Id.* at 160. We affirmed the district court's dismissal of the manufacturers' Tucker Act claims on the grounds that the Tucker Act did not provide for claims based on contracts implied-in-law, and that an implied-in-fact warranty running from the government to the manufacturers was a "bizarre and novel" theory that could not be inferred from the circumstances of the case. *Lopez*, 858 F.2d at 714–15, 716–17.[12] Although the

12. Because of our doubts regarding the conclu-    sion that the Anti–Deficiency Act barred the man-

*Lopez* decision did not go so far as to hold that a claim for breach of reverse warranty could never be brought under the Tucker Act, it made clear that any such warranty would have to be either express or implied-in-fact, rather than implied-in-law. *Id.* at 716.

Hercules has not alleged an express reverse warranty. Beyond that, we are hard-pressed to see how the circumstances of this case could support an inference that Hercules and the government came "to a meeting of the minds and [took] upon themselves [the] corresponding obligations and liabilities" that would accompany a warranty running from the purchaser to the seller. *Hercules*, 25 Cl.Ct. at 624 (citing *Hirschmann v. United States*, 11 Cl.Ct. 338, 342 (1986)).[13] We prefer, however, to rest our decision on this point on the government contractor defense. Even assuming that an implied-in-fact reverse warranty could be found and could be said to have been breached, Hercules' claim fails for the same reason that Hercules' and Thompson's claims based upon an implied warranty of specifications fail. Specifically, in view of the government contractor defense, Hercules could not prove that its damages were caused by the breach of such a warranty. Rather, Hercules' damages were the result of its decision to enter into the settlement with the Agent Orange plaintiffs.[14]

### 4. *Implied-in-fact Contractual Obligation to Indemnify*

The government used the authority provided in section 101 of the DPA, 50 U.S.C. app. § 2071(a) (1964), to require both Hercules and Thompson to enter into contracts to produce Agent Orange for the Vietnam War effort. Based upon this fact, Thompson, but not Hercules, argued in the Claims Court that, pursuant to section 707 of the DPA, 50 U.S.C. app. § 2157 (1964), it was entitled to

be indemnified by the government for its contribution to the Agent Orange settlement fund and for the expenses which it incurred in the Agent Orange litigation. The Claims Court rejected this argument. In so doing, it relied upon the reasoning of the district court in the Agent Orange litigation. *Wm. T. Thompson*, 26 Cl.Ct. at 28. There, in approving the 1984 settlement, the district court rejected the contention of the defendants that the Agent Orange plaintiffs were barred from asserting any claims against them because they were immunized from suit under section 707 of the DPA. *In re "Agent Orange"*, 597 F.Supp. at 844. The district court held that section 707, which states in part that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act," did not provide the immunity asserted by the Agent Orange defendants. 597 F.Supp. at 844–45. The district court stated:

> the protection afforded by section 707 should correspond to the risk imposed, viz., the possible need for the contractor to break its contracts with third parties or the increased risk to employees or users posed by the speeded up production.

597 F.Supp. at 845.

■ On appeal, Thompson contends that under the circumstances of the compelled production here, section 707 of the DPA operated to create an implied-in-fact obligation on the part of the government to indemnify Thompson for the damages it incurred: its contribution to the Agent Orange settlement fund and the expenses which it incurred in the Agent Orange litigation. Thompson argues that the Claims Court erred in accepting the reasoning of the district court. Specifically, Thompson contends that because section 101 of the DPA authorizes the Presi-

---

ufacturers' Tucker Act claims, we chose not to rest our decision in *Lopez* on that ground.

**13.** In view of the *Feres–Stencel Aero* doctrine, it is difficult to envision the circumstances under which a court could find on the part of the government the kind of implied-in-fact reverse warranty for which Hercules argues. *See supra* note 8.

**14.** Just as it did in connection with the implied warranty of specifications theory, the rationale of *Kania* bars Hercules' claim under a theory of reverse warranty for the recovery of attorney fees and expenses incurred in the Agent Orange litigation.

dent to compel contract performance as well as contract acceptance, the "risk imposed" is not limited to breach of contract actions arising out of preference given to DPA contracts, but rather extends to possible tort suits by third parties arising from subsequent use of the product produced under the DPA contract.

We disagree. As did the district court in the Agent Orange litigation and the Claims Court in this suit, we read section 707 of the DPA as providing a defense for a DPA contractor against a suit by a non-government customer in the event that the DPA contractor is forced to breach another contract to fulfill the government's requirements. Section 707 does not provide the kind of protection asserted by Thompson.[15]

In interpreting a statute, we first turn to its language. *VE Holding Co. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579 (Fed. Cir.1990) (citing *Mallard v. United States Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 300–01, 109 S.Ct. 1814, 1817–18, 104 L.Ed.2d 318 (1989)), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). Accordingly, we begin our analysis with the pertinent statutory provisions: sections 101 and 707 of the DPA. Section 101(a) of the DPA states:

> The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense *shall take priority* over performance under any other contract or order, and, *for the purpose of assuring such priority*, to require acceptance and performance of such contracts or orders *in preference* to other contracts or orders by any person he finds capable of their performance, and (2) to allocate materials and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.

50 U.S.C. app. § 2071(a) (1964) (emphasis supplied).

Section 707 of the DPA states as follows:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under title I of this Act or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner.

50 U.S.C. app. § 2157 (1964).

The language of section 101(a) makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled "Priority in contracts and orders." Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is "for the purpose of assuring ... priority." Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

Once a contractor has been compelled to accept a national defense contract under sec-

---

**15.** The circumstances of this case do not require us to address the holding of the district court that "the protection afforded by section 707" serves to protect DPA contractors against "the in-

creased risk to employees or users posed by ... speeded up production." *In re "Agent Orange"*, 597 F.Supp. at 845.

tion 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:

> When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.

*Amendola v. Secretary, Dep't of Health and Human Servs.*, 989 F.2d 1180, 1182 (Fed.Cir. 1993); *accord Ambassador Div. of Florsheim Shoe v. United States*, 748 F.2d 1560, 1565 (Fed.Cir.1984) (stating that where two statutory provisions are enacted *in pari materia*, a legislative intent to have the provisions "work harmoniously together" is to be inferred). To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.

Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination "against contracts to which priority is assigned . . .," reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA

contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered "commercially impracticable" by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 997 (5th Cir.1976) ("[DPA section 707] is simply declaratory of the common law [doctrine of impossibility].") (quoting *United States v. Texas Construction Company*, 224 F.2d 289, 293 (5th Cir.1955)). We also agree with the district court, *see In re "Agent Orange"*, 597 F.Supp. at 845, that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. *See, e.g., United States v. International Business Machs. Corp.*, 892 F.2d 1006, 1009 (Fed.Cir. 1989) ("Had Congress intended to make the exemptions permanent, it knew how: it could and we believe would have used words of futurity. . . .").

In sum, the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA. Accordingly, invocation of the DPA by the government for the production of Agent Orange did not give rise to an implied-in-fact contractual obligation on the part of the government to indemnify Thompson for its contribution to the Agent Orange settlement fund or for the expenses which Thompson incurred in the Agent Orange litigation.

## CONCLUSION

For the foregoing reasons, the judgments of the Claims Court are affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

PLAGER, Circuit Judge, dissenting.

The story of the litigation stemming from our Government's use of Agent Orange during the Vietnam War is long and complex. *See* **PETER H. SCHUCK, AGENT ORANGE ON TRIAL: MASS TOXIC DISASTERS IN THE COURTS** (enlarged ed., 1987). It may be that it is best to put this chapter of our nation's history behind us, and to bury the issues with the dead. Appellants, by bringing this suit, do not allow us that peace. Be that as it may, as a court of law we are obliged to give appellants whatever justice the law affords. I believe the law affords substantially more justice than the majority concedes.

The background of this particular case is set forth in some detail by the majority. Undue attention to trees, however, often hides the forest. Appellants, the Hercules and Thompson chemical companies, manufactured Agent Orange pursuant to contracts made by and with the Government. Indeed, both Hercules and Thompson allege that the contracts were for a product which they did not choose to make, and which they were compelled to produce under penalty of law. The companies, along with others, were sued some years back by veterans and their families (collectively "the *Agent Orange* plaintiffs") for injuries caused by exposure to Agent Orange when the Government used the defoliant in pursuit of its war in Vietnam; appellants claim that the Government should indemnify them for the financial losses they sustained in the settlement of the Agent Orange litigation.

Appellants present a host of arguments founded in government contract law, each of which a majority of this panel rejects. The many points of government contract law raised in this case and so finely parsed, however, should not be allowed to obscure the fundamental question: if the Government compels manufacture of a product by private companies, a product known to the Government to be potentially dangerous, and the use by the Government of the product causes

the manufacturers to incur liability, may the Government claim immunity from the consequences of its conduct? I think not.

### 1.

The answer the Government gives, and the majority accepts, to this question is that there was no liability for the manufacturers to incur—the manufacturers could not have been held liable for the injuries sustained by the *Agent Orange* plaintiffs because the manufacturers were totally protected by a doctrine known as the government contractor defense. *Op.* at 198–99. The majority concludes from this that the over twenty million dollars paid to the *Agent Orange* plaintiffs by Hercules and Thompson resulted from a "voluntary decision" by the companies. *Op.* at 200.

I find that reasoning unpersuasive. While there no doubt are civic-minded individuals in the upper ranks of both companies, and perhaps even among their lawyers, the notion that these manufacturers voluntarily made a twenty million dollar contribution to the veterans of the Vietnam War and their families out of the goodness of their hearts seems rather far fetched, and might even raise questions about their fiduciary obligations to their shareholders.[1]

The trial judge who presided over the settlement, an experienced and well-respected jurist, must have believed there was at least some ground upon which liability could be found. This was not a case in which the parties came to the judge with an agreed settlement, one which the judge without further exploration approved. As the record shows, two trial judges shared this case. The first held that, under the government contractor defense as a matter of law, neither Hercules nor Thompson were liable for the veterans' claimed injuries. *In re "Agent Orange" Prod. Liab. Litig.*, 565 F.Supp. 1263 (E.D.N.Y.1983). However, before an order to dismiss was entered by this judge, a second judge assumed the case.[2] The second

---

**1.** If the companies' lawyers advised that the making of the contribution was necessary, when the law so clearly provided an absolute and air-

tight defense to liability, there might be a malpractice issue as well.

**2.** Judge George C. Pratt, the judge originally assigned to these cases, was elevated to the Court

judge rescinded the first judge's summary judgment for the manufacturers, and denied the motion to dismiss. *In re "Agent Orange" Prod. Liab. Litig.*, 580 F.Supp. 1242 (E.D.N.Y.1984). This judge must have believed that there was a valid and ongoing "case or controversy," or the court could not have retained jurisdiction over these defendants. This same judge presided over the extensive settlement negotiations conducted in his courthouse. *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1396 (E.D.N.Y.1985); *see also* Schuck, *supra*, at 143 *et seq*. We must assume that this trial judge acted in good faith in a belief that the manufacturers might not be able to escape all liability. It ill behooves the Government, or this court, years later to question whether the trial judge properly understood the law of the case before him.

### 2.

The majority concludes that, despite what the trial judge may have believed, the Government had no liability to these contractors because of the government contractor defense as explicated in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In the majority's view, *Boyle* disposes of appellants' implied warranty of specifications theory because the Supreme Court in *Boyle* in effect immunizes contractors such as these from all liability in situations such as that in the original *Agent Orange* plaintiffs' suit. There are at least two problems with this reasoning.

For one, *Boyle* was decided in 1988, some four years after the settlement that is the subject of this suit.[3] Yet the issue as the majority poses it is not whether years later the substantive law of the case might have been found (or might have changed?) to favor the companies, but whether at the time of the settlement the companies simply gave away

money to the plaintiffs, or whether they settled under a reasonable apprehension of legal compulsion in order to minimize their (and the Government's) potential liability.

The second reason why *Boyle* is inapposite to this case is that the issue and holding in *Boyle* turned on a question of federal preemption, an issue not in this case. The question in *Boyle* is, in a suit on behalf of a deceased military officer against the manufacturer of a product purchased by the military and alleged to have caused the death, a suit which was brought under the substantive law of a particular state, may the Government's manufacturer be held liable under state tort law. The Supreme Court answered no. The suit was brought in Federal Court as a diversity suit with a state cause of action. Although the Government was not the named defendant, the Supreme Court viewed the case as implicating the Federal Tort Claims Act (FTCA), the statute in which Congress waived the Government's immunity from tort liability. *See* 28 U.S.C. § 1346(b). The Supreme Court decided that the discretionary function exemption of the FTCA applied—the design of the escape hatch of the airplane was an exercise of federal discretion, and therefore state law was displaced. *See* 28 U.S.C. § 2680(a).

In the *Agent Orange* litigation, suit was brought by the plaintiffs not as a state tort action under the FTCA, but as a federal law action based on certain federal statutes and on case law recognizing, even after *Erie*,[4] a limited scope for federal common law.[5] Jurisdiction was alleged, not in diversity, but under "the common law and/or the statutory laws of the United States of America," as a federal question case under 28 U.S.C. § 1331.[6] The original trial judge held that substantial federal interests were affected by the litigation, and that federal common law

of Appeals, and his responsibilities as the trial judge were reassigned to Chief Judge Jack Weinstein.

**3.** The Agent Orange plaintiffs filed their original suit in July 1978; after extensive pretrial proceedings, trial was set for May 7, 1984. The case was settled that day.

**4.** *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**5.** *See, e.g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 318 U.S. 744, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

**6.** *In re "Agent Orange" Prod. Liab. Litig.*, 506 F.Supp. 737, 740 (E.D.N.Y.1979).

provided both the substantive measure of liability and the basis for jurisdiction.[7]

The Second Circuit on appeal reversed the trial judge's ruling on jurisdiction, and held the case was properly in federal court, but on diversity of citizenship jurisdiction.[8] On remand the second trial judge ruled that this did not necessarily affect the substantive law of the case. In an exhaustive opinion he ruled that, as a choice of law rule, the substantive law of the case remained one of federal law: a federal or national consensus common law.[9] Thus the preemption rule—whether federal law supercedes state substantive law in these cases—which was the concern in *Boyle* has no applicability to the *Agent Orange* litigation, a litigation in which federal law defined the substantive standard to be applied.

The difficulty the majority has in finding a satisfactory rationale for the outcome it supports is understandable. The so-called "government contractor defense" is a label hung on a group of issues which first found expression in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In that case the Supreme Court was called upon to decide whether the general waiver of tort immunity contained in the Federal Tort Claims Act gave military personnel the right to sue the Federal Government under routine tort theories in state courts. The Court

held that, for a variety of policy reasons, the Act did not apply to injuries incident to military service; military personnel could not sue their employer in state courts.

Later, in *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), the Court extended *Feres* and held that neither the Government nor the manufacturer were liable to a military pilot for alleged negligence in the design and construction of an airplane's life support system. However, the Court in *Stencel* revisited the policy arguments on which *Feres* stood, and revised its rationale for the result. Thus began a series of cases in which the Court has tried to find a reasoned basis for the military exception rule,[10] culminating in *United States v. Johnson*, in which four members of the Court were of the view that *Feres* had been wrongly decided,[11] and finally *Boyle*, with a different rationale altogether, keyed to the language of the FTCA itself.[12]

In light of this history, to suggest that the evolving government contractor defense would clearly dictate the outcome in the original *Agent Orange* litigation seems to me to be unwarranted historical revisionism, out of place in the decision before us in this case. I do not know what the ultimate decision in the *Agent Orange* litigation would have been on this issue, nor does anyone.[13] Since I find

7. *Id.* at 744.

8. *In re "Agent Orange" Prod. Liab. Litig.*, 635 F.2d 987 (2d Cir.1980).

9. *In re "Agent Orange" Prod. Liab. Litig.*, 580 F.Supp. 690 (E.D.N.Y.1984).

10. *See, e.g., United States v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985).

11. *United States v. Johnson*, 481 U.S. 681, 692, 107 S.Ct. 2063, 2069, 95 L.Ed.2d 648 (1987) (Justice Scalia, with whom Justices Brennan, Marshall, and Stevens joined, dissenting).

12. Although the question of government liability to military personnel would seem of direct interest to only a small segment of the legal profession, the *Feres–Stencel–Boyle* cases have generated their share of academic attention, largely critical. One of the most recent and exhaustive reviews is David E. Seidelson, *From* Feres v. United States *to* Boyle v. United Technologies Corp.: *An Examination of Supreme Court Jurisprudence and a Couple of Suggestions*, 32 Duq.

L.Rev. 219 (1994). *See also* Michael D. Green and Richard A. Matasar, *The Supreme Court and the Products Liability Crisis: Lessons from* Boyle's *Government Contractor Defense*, 63 S.Cal. L.Rev. 637 (1990); Barry Kellman, *Judicial Abdication of Military Tort Accountability: But Who is to Guard the Guards Themselves?*, 1989 Duke L.J. 1597; John Paul Stevens, *Is Justice Irrelevant?*, 87 Nw.U.L.Rev. 1121 (1993).

13. In its 1987 opinion upholding both the settlement in the original litigation and Judge Weinstein's later dismissal of the 'opt-out' cases, the Second Circuit had to walk a tight line. In effect, the court had to find a cause of action for the one (in support of the trial judge's denial of the motion to dismiss the original defendants), but not for the other (in support of the grant of the motion to dismiss regarding the opt-outs). The Second Circuit opined that "in the light of hindsight, some 15 to 20 years after the fact, the weight of present scientific evidence does not establish that personnel in Vietnam were injured by Agent Orange, and there cannot have been a breach of an earlier duty to inform the govern-

**208**

unpersuasive the majority's defense of the trial judge's summary judgment on this point, and since I believe there are a number of unresolved fact and law issues, I would return the case to the Court of Federal Claims with instructions to hold a full trial on the issues.

### 3.

A few remaining observations about the trees. The majority has also rejected appellants' theory of government liability under the doctrine of superior knowledge. If the Government's knowledge is superior to that of the contractor, the Government may incur liability if it fails to disclose information required by the contractor. There are "instances in which the defendant [the Government] is clearly under such an affirmative obligation and cannot remain silent." *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 778, 160 Ct.Cl. 437 (1963). The Government had more knowledge of the potential harm caused by Agent Orange than did appellants, who had not participated in the development of, had little experience with, and were relatively ignorant regarding the health hazards posed by, Agent Orange. Thus appellants contend that the Government is responsible for the harms caused to the *Agent Orange* plaintiffs, and that consequently the Government should pay appellants' share of the settlement fund.

The majority disagrees. It understands *American Ship Building Co. v. United States*, 654 F.2d 75, 228 Ct.Cl. 220 (1981), to require that the Government divulge information *only* when the contractor's ignorance would hinder the contractor's *performance* of the contract. In this case, the costs imposed on the appellants are the result of a settlement reached long after performance had ceased. The majority therefore holds that appellants cannot recover under the doctrine

of superior knowledge because the damages arose after performance.

There is neither prior authority nor present reason to limit the doctrine of superior knowledge to require compensation only for difficulties incurred during performance.

> The doctrine of superior knowledge *is generally applied* to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information. *See, e.g. Helene Curtis Industries, Inc. v. United States*, 160 Ct. Cl. 437, 312 F.2d 774 (1963).

*American Ship*, 654 F.2d at 79 (emphasis supplied). Contrary to the majority's deployment of the case, nothing in *American Ship* confines the doctrine of superior knowledge to information regarding the performance of contracts. *American Ship* merely notes that the doctrine has **generally** been invoked in cases in which the contractor's performance was hindered because of the Government's failure to divulge information.

The majority differentiates the doctrine of superior knowledge from the doctrine of implied warranty of specification, announced in *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). The majority acknowledges that, under the latter doctrine, government liability is not limited to contract performance, but extends to later losses as well. *Op.* at 197. *Spearin* requires that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.*, 248 U.S. at 136, 39 S.Ct. at 61. The theory is that the author of

---

ment of known hazards." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 174 (2d Cir. 1987). In like vein the court thought that "defendants clearly did not breach any duty to inform the government of hazards relating to Agent Orange," and thus were protected by the 'military contractor defense.' *Id.* at 173. To the extent those conclusions were invoked as a ratio-

nale for affirming the judgments against the opt-out plaintiffs, they are arguably defensible given the burdens of proof and deference owed the trial judge. However, as a basis for initially predicting the eventual outcome of the original litigation, they would be inconsistent with the position taken by Judge Weinstein, and are speculative.

a plan detailed enough to comprise specifications often possesses knowledge superior to that of the party who contracts to execute that plan. "Specifications so susceptible of a misleading reading (or implication) subject the [Government] to answer to a contractor who has actually been misled to his injury. *United States v. Spearin,* 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918)." *Helene Curtis,* 312 F.2d at 778 (citation abbreviated).

However, as the quotation above from *American Ship* indicates, the Court of Claims in *American Ship* relied on *Helene Curtis,* which is in turn founded on *Spearin.* The doctrines of superior knowledge and the implied warranty of specification are thus different expressions of a single principle. Both doctrines ultimately rest upon general contract law. If the Government's incomplete or misleading information, or its particular specification of its requirements, imposes losses, now or later, on the contractor, then the Government, like any other contractor, should not escape responsibility. That responsibility may well extend beyond the period of performance of the contract; there is no reason to hold that the doctrine of superior knowledge makes the Government responsible only for hindrances to performance of the contract.

Finally, as noted earlier, the Government compelled appellants to produce Agent Orange under the authority granted by the . Defense Production Act (DPA), 50 U.S.C. app. §§ 2061 *et seq.* (1964). The DPA requires manufacturers to accept contracts deemed necessary to the national defense, and further requires manufacturers to give such contracts absolute priority over other obligations. 50 U.S.C. app. § 2071(a) (1964).

The DPA also includes a "hold harmless" provision, 50 U.S.C. app. § 2157 (1964), that states:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act ...

The Court of Federal Claims rejected Thompson's argument that § 2157 immunizes the manufacturers from liability for any eventual use of the defoliant.[14] It held that the provision should be read narrowly, to apply only to liability caused by giving the Government its claimed priority for production. Thompson argues that even if that is so, the provision at least supports the conclusion that there is an implied-in-fact obligation on the part of the Government to indemnify Thompson for the damages incurred. The majority agrees with the trial court's reading of the provision, and concludes that the immunity—like the common-law doctrine of impossibility of performance—extends only to contract breaches required by the Government's imposition. From that, the majority concludes that the Government is immune from the claims of the manufacturers.

I have three problems with the majority's reading of the DPA. ' First, the majority's conclusion is a *non sequitur:* that the Act grants manufacturers immunity against third parties on contractual claims does not suggest, much less require, that the Act grants the Government immunity against manufacturers who suffer other losses.

Second, although justice may be blind, judges should take some cognizance of practical realities. A statute that gives the Government the authority to force private manufacturers to accept contracts and to place such contracts before their other obligations gives the Government substantial operational control over those enterprises. Under the DPA, the Government in effect can seize the company. Congress recognized that reality, and specified a hold harmless clause in the Act.

Third, the majority ignores the language of the statute. The majority argues that "if Congress had intended [the statute] to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms." *Op.* at 204. The *Agent Orange* litigation was historic, and was both substantively and procedurally unimaginable at the time of the passage

---

14. Interestingly, both Hercules and Thompson alleged in their complaints that they had been compelled under the Defense Production Act to manufacture Agent Orange, but only Thompson briefed on appeal the question of whether the 'hold harmless' clause of the Act applied.

of the Defense Production Act. We should not expect Congress to have specifically described a liability problem arising from a judicial process of which they could have had scant idea. Yet if Congress intended to limit the sweeping scope of the hold harmless provision to contract performance only, Congress could have written, for example, "No person shall be held liable for **breach of contractual obligations** caused by any act or failure to act, etc." That is not the language of the statute. It is difficult to imagine more "clear and unequivocal" terms than that actually used by Congress: *"No person shall be held liable for damages* or penalties for any act or failure to act resulting *directly or indirectly* from compliance with a rule, regulation, or order issued pursuant to this Act ..." 50 U.S.C. app. § 2157 (1964). The law as well as the circumstances support the Government's liability.

### 4.

Over the past several years the parties to this litigation and the courts have expended much effort phrasing the issues presented by this case in terms of government contract law. As the preceding discussion suggests, however, the conceptual grammar of government contract law may be inadequate to the task. Because the relationship between appellants and the Government was never arms-length, any discussion of that relationship in doctrinal terms that presume freedom of contract is incoherent.

The twenty million dollars or so at stake in this litigation may be small potatoes to the Federal Government, and we do not know how much the money means to the financial health of appellants. But if there ever is a case in which we can fairly say, it is not the money, it is the principle that matters, this is the case. At the core of this litigation is the way in which our nation distributes the burden of its military activity among its citizens. In wartime, that burden is inevitably distributed unevenly. We cleave to the Constitution, however, in spite of unfairness. The Constitution provides an apt analogy—the Takings Clause of the Fifth Amendment is "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). The question in this case is whether the public should pay for the damages that the federal judiciary has attributed to the use of Agent Orange in Vietnam, or whether appellants alone should bear the burden.

The Government took away appellants' control over their businesses. By assuming control, the Government deprived appellants of their ability to conduct themselves prudently, and instead forced appellants to engage in a dangerous enterprise, the manufacture of Agent Orange. In exposing appellants to risk, the Government incurred an obligation to make appellants whole should the danger come to pass. The danger of the Government's use of Agent Orange is now clear, or as clear as our law can make it. Equally clear is the Government's obligation to indemnify appellants. No amount of niggling at doctrine can obscure that simple truth.

I respectfully dissent.