ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Siemens Government Technologies, Inc. | ) | ASBCA Nos. 62601, 62602 |
| | ) | |
| Under Contract No. DE-AM36-09GO29041 | ) | |
| T.O. No. N39430-18-F-9924 | ) | |

APPEARANCES FOR THE APPELLANT:     Andy Liu, Esq.
                                   Robert S. Nichols, Esq.
                                   Andrew J. Victor, Esq.
                                   Sam Van Kopp, Esq.
                                     Nichols Liu LLP
                                     Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Craig D. Jensen, Esq.
                                     Navy Chief Trial Attorney
                                   Robyn L. Hamady, Esq.
                                     Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS ON THE
GOVERNMENT'S MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT

Appellant, Siemens Government Technologies, Inc. (Siemens or SGT) entered into a master Indefinite Delivery Indefinite Quantity (IDIQ) Energy Savings Performance Contract with the Department of Energy (DOE). Pursuant to the master contract, government agencies can request that Siemens propose energy savings measures to the agency. Depending on the results of Siemens' investigation, the agency can enter into a contract (task order) with Siemens where Siemens will perform energy upgrades and recoup its expenses based on a specified share of the energy savings realized by the agency. The government agency benefits from the program by obtaining energy upgrades without incurring the upfront costs.

In September 2014, the Navy (Navy or government) issued a request to Siemens to perform a preliminary assessment of certain facilities in Europe, Africa, and Southwest Asia. Due to the greater expense of performing the energy audits in foreign countries, Siemens requested assurances from the Navy that it would be compensated for the costs of its preliminary investigations. The Navy declined to provide any assurances, and reminded Siemens that the DOE master contract provided that the contractor would not be compensated for work performed in locations that were not subsequently covered by a task order.

Siemens performed preliminary investigations in six locations in Bahrain, Djibouti, Greece, Italy (2 locations), and Spain. However, after sending its workers to Camp Lemonnier, Djibouti and Souda Bay, Greece, Siemens discovered that the Navy facilities had already initiated work on certain energy upgrades that made the upgrades contemplated by Siemens non-viable. The Navy ultimately entered into a task order for three of the remaining projects. Siemens filed a claim with the Navy for the costs it incurred at Camp Lemonnier and Souda Bay, asserting a breach of the duty of good faith and fair dealing, superior knowledge, and entitlement pursuant to *quantum meruit*. The Navy contracting officer denied Siemens' claims, and Siemens appealed to the Board. For the reasons stated below, we deny Siemens' appeals.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

**A. The DOE Master Contract**

On October 11, 2007, the Department of Energy issued Contract DE-AM36-09GO29041 (DOE master contract) to Siemens Government Services, Inc. now known as Siemens Government Technologies (R4, tab 1). The DOE master contract allows federal agencies, such as the Navy, to issue task orders for Energy Savings Performance Contract (ESPC) work whereby Energy Savings Contractors (ESCOs) propose and validate Energy Savings Measures (ESMs) (also referred to as Energy Conservation Measures (ECMs)), that, if accepted and included in an agency-issued task order, would reduce energy and operating costs (42 U.S.C. § 8287, *et seq*.; Federal Acquisition Regulation (FAR) § 2.101; FAR § 23.205; R4, tab 10 at GOV322). An energy savings performance contract allows a federal agency to obtain energy savings and facility improvements with no up-front capital costs; and, in return, the energy savings contractor is paid from the agency's cost savings. *See* FAR § 23.205(b)(1).

The DOE master contract provides that a task order is "[t]he obligating document that provides the details and requirements for the order of an energy savings performance contract project, placed against an established master indefinite delivery/indefinite quantity contract" (R4, tab 10 at GOV398). Section C.11 "GOVERNMENT PROJECTS" provides in relevant part: "[t]he agency shall notify the contractor when agency projects are to be implemented that may impact the installation or operations of contractor-installed ECMs" (*id.* at GOV334).

Section H outlines the steps leading to a task order award: (1) agency contracting officer issues a Notice of Opportunity; (2) ESCO submits an Expression of Interest[1] (EOI); (3) ESCO submits a Preliminary Assessment (PA); (4) agency

---

[1] An Expression of Interest is defined as "[a]n IDIQ contract holder's written response to an agency Contracting Officer's notification of a potential ESPC task order

2

contracting officer issues a Notice of Intent to Award (NOI or NOITA); (5) the agency contracting officer issues a Task Order Request For Proposals (TO RFP); (6) the ESCO submits an Investment Grade Audit (IGA); (7) the ESCO submits a Final Proposal Based on the IGA; and (8) award of Task Order (*id.* at GOV350-64).

The DOE master contract defines a "preliminary assessment" as a procedure that may include an energy cost savings evaluation as part of developing preliminary technical and price proposals before the agency issues a notice of intent to award a task order. "Although a PA may include a technical concept and price assessment, it is not a binding offer and does not include the text of a financing agreement" (*id.* at GOV397). Section H.4.1 of the DOE master contract states: "[t]he agency will not be liable for any costs associated with PA audits or preparation of the PA unless the project addressed by the PA later becomes a TO award" (*id.* at GOV354).

An Investment Grade Audit (IGA) is: "[a] procedure which may include, but is not limited to, a detailed analysis of the energy cost savings and energy unit savings potential, building conditions, energy consumption, and hours of use or occupancy for a facility, for the purposes of preparing final technical and price Proposals" (*id.* at GOV396). Section H.5 addresses IGA requirements. It states: "[f]ollowing issuance by the agency of the NOI, the selected contractor shall conduct an Investment Grade Audit (IGA) of facilities and energy systems at the project site to substantiate the contractor's ability to achieve the estimated total cost savings . . . " (*id.* at GOV357). Section H.6, "Requirements for Proposal and Proposal Review for Task Orders," states at H.6.1. that "[t]he contractor shall submit a Proposal, consisting of technical and price components . . . for each task order . . ." (*id.* at GOV0357). Proposal is defined as "a written, binding offer from a contractor that includes technical and price Proposals and the text of any financing agreement (including a lease acquisition)" (*id.* at GOV397).

Section H.6.2 provides that "[p]roposals will be reviewed in accordance with the instructions set forth in the TO RFP. The agency will not be responsible for any costs incurred, such as Proposal preparation costs or the costs incurred in conducting the IGA, unless a TO is awarded or authorized by the agency CO" (*id.* at GOV358). Section H.6.3 provides that "Proposals" include Price and Technical proposals (*id.* at GOV358-62). The price proposal requires "supporting documents" including "project-level expenses" from project development through award of the task order (*id.* at GOV361). "Project development" is defined as including "all work activities that occur after the agency issues a notice of intent to award task order" including "direct costs associated with the development of an IGA" (*id.* at GOV397).

that expresses its interesting [sic] in pursuing an ESPC project" (R4, tab 10 at GOV394).

3

## B. The Navy's Request for Preliminary Assessment

On September 19, 2014, Danielle Kincaid, a Contract Specialist for the Naval Facilities Engineering Command (NAVFAC) Engineering and Expeditionary Warfare Center (EXWC) issued a Request for Preliminary Assessment (RPA) for project number N39430-14-F-EURAFSWA Energy Savings Performance Contract FEC EURAFSWA to Siemens (R4, tab 13 at GOV479-80). Section 1 set forth the "General Requirements/ Project Scope," which requested that Siemens evaluate Commander, Navy Installations Command (CNIC)-owned facilities only, located within the EURAFSWA Regional Installations at Camp Lemonnier, Djibouti (CLDJ), Naval Air Station (NAS) Sigonella, Italy, Naval Station (NAVSTA) Rota Spain, Naval Support Activity (NSA) Naples Italy, NSA Souda Bay Greece, and NSA Bahrain (*id.* at GOV481-83). The RPA specified that the "PA shall be submitted no later than 3 March 2015" and that "[u]pon Government approval of the Contractor's PA, the Government will issue a task order request for proposal (TO RFP) requesting that the Contractor perform an investment grade audit and submit a final proposal" (*id.* at GOV487-88). On May 4, 2015, Siemens submitted a PA for Camp Lemonnier and another for Souda Bay (app. R4, tabs 42-43).

By letter dated August 18, 2015, Siemens wrote to Contracting Officer Carolyn Contreras regarding the H.6.2. clause of the DOE contract:

> As you know, Siemens Government Technologies, Inc. (SGT) continues to work toward IGA preparation and NOITA receipt for the six (6) Preliminary Assessments (PA) submitted to NAVFAC on May 4, 2015 for the subject ESPC project.
>
> Considering the complexity and size of executing six (6) concurrent IGAs overseas, SGT anticipates that the IGA costs invested by SGT will be approximately twelve to fifteen times greater than the typical investment to develop an ESPC project.
>
> Prior to Task Order award, there are a number of factors that could lead the Navy to cancel, in whole or in part, the IGA through no fault of SGT. This would place SGT's significant investment at risk of not being recovered. We would like to work with the Navy to jointly manage this risk.
>
> Given the significant development costs associated with this unprecedented region wide, 6 site ESPC project, SGT

> respectfully requests NAVFAC's assurance that, pursuant
> to reference (a) of the subject contract and, absent
> unsatisfactory performance of the part of SGT, SGT will
> be entitled to recover its IGA incurred costs in the event
> NAVFAC does not issue a Task Order for the
> EURAFSWA project.

(Gov't mot. attach. 1 at 1-2).

On September 10, 2015, Contracting Officer Bryson Jo responded by email to Siemens' August 18, 2015 letter, noting that the Navy has "considered your requests for . . . assurance regarding recovery of costs if the project is cancelled . . . " Mr. Jo's response provides in pertinent part:

> Regarding the requested assurance for recovery of costs,
> our position, consistent with the DOE IDIQ, is that the
> Navy will not be responsible for any relevant costs
> incurred unless a subsequent task order is awarded.
> Although we understand SGT's position that with 6 sites
> there is additional development cost risk, we do not believe
> that the risk is significantly greater to the extent that there
> is a need to deviate from the Navy's position above. We
> are looking forward to a mutually beneficial project and
> have no reason to believe SGT will not emerge from this
> process with an awarded task order.

(Gov't mot. attach. 2 at 1).

### C. The Navy's Notice of Intent to Award and Request for Proposals

On December 1, 2015, Contracting Officer Bryson Jo issued a "NOTICE OF INTENT (NOI) TO AWARD UP TO FIVE PROPOSED TASK ORDERS" under the DOE contract for NAVFAC EURAFSWA (R4, tab 14 at GOV495). The NOITA provided in pertinent part that Siemens should perform investment grade audits and submit final proposals that verify the accuracy of the proposed energy cost savings.

> This notice of intent does not commit the Government to
> award a Task Order, or to pay for any of the costs incurred
> in making the necessary studies or designs for the

5

preparation thereof, or to contract for said services or designs.

(*Id.*).


On March 8, 2016, Ms. Kincaid issued TO RFP Number N39430-14-F-EURAFSWA Energy Saving Performance Contract FEC EURAFSWA for Camp Lemonnier (R4, tab 17). The Camp Lemonnier TO RFP states that the "IGA and the [final proposal (FP)] will be conducted in accordance with the basic DOE IDIQ Contract" and that the "contractor shall submit its final proposal encompassing all ECMs included in section C.2, no later than 24 February 2017" (*id.* at GOV577-78). Around the time that the Navy issued the NOITA, Navy personnel became aware that the Navy's Resilient Energy Program Office (REPO) was simultaneously evaluating possible energy saving improvements at Camp Lemonnier. In an email chain dating between March 18, 2016 and March 25, 2016, Navy employees debated whether they should inform Siemens of the REPO evaluation, and expressed concern that withholding the information could harm Siemens financially (app. resp. ex. 1 at GOV1864-66). The Navy employees recommended that Siemens be directed to continue with the IGA since the Navy was not liable for Siemens' development costs pursuant to the DOE master contract (*id.* at GOV1865).

On May 3, 2016, Siemens "held a kickoff meeting at Camp Lemonnier Djibouti (CLDJ) to start the IGA based on the scope of work provided as part of the TORFP received on 03/08/2016" (R4, tab 18 at 1). On May 17, 2016, Siemens wrote a letter informing the Navy that "[d]uring the first few days of the site visit SGT was provided with documentation regarding different projects, outside of the ESPC, that are currently being implemented . . . that directly impact [ ] the scope of work defined in the TORFP received in March 2016" (*id.*). Siemens identified demand and supply-side energy conservation and saving measures "in implementation" that it claimed would "dramatically impact the viability" of ECM identified in the TO RFP (*id.*). Additionally, SGT noted it learned of "planned projects" which, if funded, would negatively impact the viability of other upgrades (*id.*). Siemens closed the letter by proposing "to perform a desktop engineering analysis to be completed within the next 30 days to (1) determine the remaining viability of supply side ECMs for inclusion in the IGA and (2) confirm the elimination of demand side ECMs" (*id.*). Siemens' May 17, 2016 letter enclosed a "CLDJ Scope of Work Reduction Report," which provided an explanation of on-going projects that it concluded impacted certain ECMs (R4, tab 18.1 at 1).

**D. The Navy's Task Order Request for Proposal for Souda Bay and Kickoff Meeting**

On December 2, 2015, Ms. Kinkaid issued a TO RFP to Siemens for Souda Bay. The RFP number was N39430-14-F-EURAFSWA, and final proposals were due on June 30, 2016 (R4, tab 15 at GOV496-98). Section C.2 of the Souda Bay TO RFP provides a list of five technology categories to be "included for the scope of the Investment Grade Audit/Final Proposal," and Table A-1 provided a list of five ECMs based on the five technology categories. (*Id*. at GOV498, 559) Section I of the Souda Bay TO RFP includes contract clauses applicable to the TO and provides that "[u]nless otherwise specified all terms and conditions and clauses specified in the basic contract apply to this Task Order" (*id.* at GOV543).

On February 5, 2016, Siemens held a kickoff meeting at NAS Souda Bay to begin the IGA (compl. ¶ 25; R4, tab 40 at GOV1532-33). During that kickoff meeting the Navy informed SGT of different construction and infrastructure projects, outside of the ESPC, that were planned or ongoing at Souda Bay (R4, tab 40 at GOV1532; app. R4, tab 52 at 2 (stating that "SGT learned for the first time at a February 5, 2016 Souda Bay kick-off meeting with the Navy that certain other non-ESPC construction projects at the site were taking place that directly impacted the ESPC scope of work as set for[t]h in the TORFP")). On February 19, 2016, Siemens sent an email to the Navy in which it listed other ECM projects that Siemens concluded resulted in "ECM scope reductions due to contract actions" and "scoped ECMs to other contractors" that impact the ESPC efforts Siemens was undertaking in Rota, Sigonella, Souda Bay, and Naples[2] (R4, tab 16 at GOV561).

On April 13, 2016, Siemens sent a letter to the Navy notifying it that the other construction projects directly affected approximately 65% of Siemens' initial project implementation cost at Souda Bay, specifically at Buildings 48, 49, and 56 (app. R4, tab 45 at 2; R4, tab 40 at GOV1532). On June 14, 2016, the Navy recognized that Souda Bay "has implemented FY 16 projects that effect the ESPC savings" that caused the project to be nonviable. The Navy email noted that "[e]very ECM has been touched in some way—reduction or technically nonviable," and that the EURAFSWA projects generally were "hanging on a thread due to the low escalation rate." (App. resp. ex. 6 at 1)

---

[2] The Bahrain project is not part of Siemens' claims, and there is no further reference to the project in the record.

**D. CLJD and Souda No Longer Viable**

On June 21, 2016, Siemens provided its "analysis of the CLDJ project based on the significant scope changes by the Navy that occurred subsequent to the issuance of the Task Order Request for Proposal" (R4, tab 19 at GOV666). Siemens informed the Navy that the ESPC project at CLDJ "is no longer viable" (*id*.). On June 23, 2016, Siemens provided the Navy its "analysis of the Souda Bay project based on the significant scope changes by the Navy subsequent to the issuance of the Task Order Request for Proposal" (R4, tab 20 at GOV668). Siemens informed the Navy that the ESPC project at Souda Bay "is no longer economically viable" (*id*.). Siemens explained that "the project has suffered significant de-scoping of approximately 50% or $6 million . . . which was caused by overlapping government funded projects, many of which were only discovered during the Investment Grade Audit (IGA) site visit" (*id*.). Siemens also explained that for Souda Bay "key project parameters, such as utility escalation rates, have drastically changed" from the PA to the IGA and that the "impact of the de-scope was so great that even using the historical data-driven escalation rates submitted in the Siemens Utility Cost Escalation Analysis white paper, the project is still not viable" (*id*.). Siemens requested "the Navy immediately eliminate the site from the EURAFSWA ESPC program, and provide us with appropriate guidance." (*Id*.)

Also on June 23, 2016, Alan Bloodgood of Siemens wrote to Captain Jayson D. Mitchell, Commander Naval Facilities Engineering and Expeditionary Warfare Center Port Hueneme, informing him that CLDJ and Souda Bay were "no longer economically viable" due in part to, "funded projects at the sites [that] were allowed to directly conflict with essential demand-side Energy Conservation Measures (ECMs) selected by the Navy for the ESPC that provided large savings" (R4, tab 21 at GOV672).

On that same date, On June 23, 2016, the Navy emailed Siemens, recognizing that parallel energy savings procurements had undermined the ESPC contract. The Navy conceded that the ordering agency failed to coordinate with the site installation commanders to prevent parallel procurements, stating that: "[w]e thought we had the respective installations onboard with the needed scope and now we are finding that is not necessarily the case." (App. resp. ex. 5 at GOV1860)

8

### E. Four Revisions to The NOITA

On July 21, 2016, Contracting Officer Eric Ford issued a revised NOI "to extend the IGA deadline from 30 June 2016 to 31 January 2017" (R4, tab 22 at GOV0674). On November 14, 2016, Russell Dominy, Director of Acquisition EXWC, issued a second revised NOI "to extend the IGA deadline from 31 January 2017 to 31 March 2017 [and to] confirm the option to submit a single proposal in the event a single multi-site Task Order is awarded (R4, tab 23 at GOV675). The second revised NOITA provided in pertinent part that Siemens should "bundle" the Naples, Sigonella, and Rota sites into a single annual payment (*id.*). By letter dated April 7, 2017, Contracting Officer Tom Madeira informed Siemens that the Souda Bay site had been removed from consideration because the site was non-viable (R4, tab 26 at GOV680).

On April 7, 2017, Contracting Officer Tom Madeira issued a third revision to the NOITA that provided additional time to include expanded energy conservation measures, and extended the deadline to May 26, 2017 (R4, tab 24 at GOV677). On May 11, 2017, Tom Madeira issued a fourth revised NOITA to permit Siemens to include additional information, and again extended the deadline, this time to July 14, 2017 (R4, tab 27 at GOV692). Each of the four revised NOIs, as well as the April 7, 2017 letter informing Siemens that Souda Bay had been removed from consideration, included the language from the original NOI:

> This notice of intent does not commit the Government to award a Task Order, or to pay for any of the costs incurred in making the necessary studies or designs for the preparation thereof, or to contract for said services or designs.

(R4, tab 22 at GOV674, tab 23 at GOV675, tab 24 at GOV677, tab 26 at GOV680, tab 27 at GOV692).

### G. Task Order Award for Rota, Sigonella, And Naples

On September 26, 2018, the Navy awarded Task Order No. N39430-18-F-9924 to Siemens pursuant to IDIQ contract DE-AM36-09GO29041 (R4, tab 29 at GOV695). The Task Order only included ECMs for work at Rota, Sigonella, and Naples (R4, tab 29 at GOV698; compl. ¶ 35). The awarded task order does not provide for reimbursement of development costs associated with the preliminary assessment and investment grade audit for Camp Lemonnier or Souda Bay (R4, tab 29). Siemens never submitted a Final Proposal/Investment Grade Audit for either Souda Bay or Camp Lemonnier (gov't mot. attach. 3, Decl. of Daniel T. Magro, dtd. September 22, 2021

(Magro decl.) ¶ 3)). Costs for the development of preliminary assessments and investment grade audits /Final Proposals at Souda Bay and Camp Lemonnier were not included in negotiations or the final awarded Task Order for work at Naples, Sigonella and Rota (*id*. at ¶ 4). On March 19, 2019, Navy Contract Officer Julianne Kowalski informed Siemens that "the ESPC project at Camp Lemonnier, Djibouti is hereby cancelled" (R4, tab 30, at GOV957; compl. ¶ 36).

## H. Siemens' Certified Claims, And Requests for Reconsideration

On December 17, 2019, Siemens submitted a certified claim to the Navy contracting officer pursuant to task order no. N39430-18-F-9924 relating to Camp Lemonnier (R4, tab 37 at GOV1514; compl. ¶ 1). In its claim, Siemens sought $4,409,643.97, related to development costs it incurred "associated with the PA and IGA aspects of the CLDJ Project" (R4, tab 37 at GOV1517). On January 7, 2020, Siemens submitted a certified claim to the Navy contracting officer pursuant to task order no. N39430-18-F-9924 relating to Souda Bay (R4, tab 38 at GOV1521; compl. ¶ 1). In its claim, Siemens sought $772,998.00 in "development costs associated with the PA and IGA aspects of the Souda Bay Project" (R4, tab 38 at GOV1524). In both claims, Siemens alleged that the Navy: (1) possessed the discretion to award it proposal preparation costs pursuant to sections H.4.1 and H.6.2 of the DOE Contract; and (2) breached the implied covenant of good faith and fair dealing implicit in the task orders, because it eliminated ECMs (Souda Bay) or "critical demand side savings at CLDJ," as a result of other Navy projects, which made the original projects either not viable or unachievable. Siemens alleged in both claims that "[t]hese parallel efforts were either known or should have been known to the Navy at the time it issued its RPA to SGT, yet this information was never communicated to SGT" (R4, tab 37 at GOV1516; tab 38 at GOV1523).

On April 7, 2020 the contracting officer issued final decisions, denying both of Siemens' claims (R4, tabs 39-40; compl. ¶ 2). In the final decisions, the Navy denied Siemens' claims because "[t]he language of DOE [contract] is clear that the Agency is not responsible for any proposal or IGA preparation costs" (R4, tab 39 at GOV1528; tab 40 at GOV1533). The contracting officer also concluded that the Navy did not violate the implied covenant of good faith and fair dealing, explaining that the Navy's cancellation of the two TO RFPs was a reasonable exercise of its discretion because both projects were determined not to be viable; and, under the DOE contract and ESPC project structure, the Navy would have "no means to award and fund the task order if the project was not viable and no energy savings would be realized" (R4, tab 39 at GOV1529; tab 40 at GOV1534). The contracting officer also explained that the Navy did not act in bad faith because the information regarding the new planned projects at Souda Bay and Camp Lemonnier "was not available until after the Contracting Officer issued the RPA, so he could not have known about it in advance"

(R4, tab 39 at GOV1529, tab 40 at GOV1534). Finally, the contracting officer noted that the Navy had never promised to award task orders for each of the identified programmed installations, and that it had repeatedly indicated in written communications that the award of any task order was predicated on what was beneficial to the Government (R4, tab 39 at GOV1529, tab 40 at GOV1534).

Following the denial of the COFDs, on May 5, 2020, Siemens filed letters requesting that the Navy reconsider the denial of both claims (app. R4, tabs 52-53). On June 29, 2020, Siemens again requested reconsideration of its claims, and asserted that its claim that the Navy violated the duty of good faith and fair dealing was based on the doctrines of superior knowledge and *quantum meruit*. (Gov't mot. attach. 4 at 1-2 (asserting "SGT's claims are actually based on the Navy's breach of its implied duty of good faith and fair dealing, including, *inter alia*, the doctrines of superior knowledge and quantum meruit . . ."); compl. ¶ 3)). Siemens explained that its theory of *quantum meruit* was based on the following position: "[w]hen an agency chooses not to ratify a transaction, a contractor may request payment, or submit a *quantum meruit* claim, for benefits conferred during the procurement process" (gov't mot. attach. 4 at 8). Siemens also acknowledged that "neither the Boards of Contract Appeals nor the courts retain jurisdiction over such claims, the GAO maintains authority to opine on *quantum meruit* within its general claims settlement jurisdiction" (*id.* at 9).

## I.    ASBCA Appeal

Siemens timely filed two notices of appeal on July 7, 2020 (compl. ¶ 4). The Board consolidated the appeals on July 9, 2020. (*id.*) In its complaint, Siemens explained that the certified claims regarding Camp Lemonnier and Souda Bay were submitted "pursuant to Task Order No. N39430-18-F-9924" (compl. ¶¶ 1, 9; R4, tabs 44-45). Siemens further explained that "[t]his appeal concerns work SGT performed identifying ECM projects at two facilities: Camp Lemonnier, Djibouti ('CLDJ') and Souda Bay, Greece ('Souda Bay')" and the "significant costs" it incurred "preparing detailed Preliminary Assessments ('PAs') of both facilities" and "conduct[ing] an investment grade audit ('IGA') of selected ECMs at both facilities" when the Navy ended up cancelling "that portion of the task order [work at Souda Bay and CLDJ] and awarded the remainder to SGT" (compl. at 1-2). As set forth in the complaint, Siemens seeks $5,182,641.97 in damages, and asserts that the Navy: (1) breached the implied covenant of good faith and fair dealing by "failing to take actions necessary to preserve SGT's reasonable expectations from the contract and by taking affirmative actions to frustrate those expectations;" (2) failed to disclose its superior knowledge; and (3) was liable for benefits conferred and "arising through an implied-in-fact contract" (compl. ¶¶ 51-62).

<u>DECISION</u>

## I.      Standard of Review

We will grant summary judgment only if there is "no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). "A genuine issue of material fact arises when the nonmovant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the nonmovant." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993) (citation omitted).

The government's motion additionally seeks dismissal of Siemens' third cause of action for lack of jurisdiction. For that portion of the motion, Siemens bears the burden of proving the Board's subject matter jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *United Healthcare Partners, Inc.*, ASBCA No. 58123, 13 BCA ¶ 35,277 at 173,156.

## II.     The ESPC Award Process

The contracting process involves a number of steps, as set forth above. As our evaluation of Siemens' claim depends, in part, on when a contract is formed, a summary of the process is helpful. There is a four-step process for a contractor to submit its offer: (1) a preliminary assessment; (2) draft IGA; (3) draft proposal; and (4) a Final IGA/Proposal (gov't reply at 6). The final IGA/Proposal is the "offer" that will result in a task order (the contract) if the proposal is accepted by the government (*id.*).

The DOE master contract is clear that "[t]he agency will not be liable for any costs associated with PA audits or preparation of the PA *unless the project addressed by the PA* later becomes a TO award" (R4, tab 10 at GOV354) (emphasis added). Additionally, § H.6.2. provides that "[t]he agency will not be responsible for any costs

incurred, such as Proposal preparation costs or the costs incurred in conducting the IGA, unless a TO is awarded or authorized by the agency CO" (R4, tab 10 at GOV358).

Siemens recognized that it would be exposed to financial risk in preparing preliminary assessments for the foreign facilities (gov't mot., attach. 1 at 1-2) ("SGT respectfully requests NAVFAC's assurance that . . . absent unsatisfactory performance on the part of SGT, SGT will be entitled to recover its IGA incurred costs in the event NAVFAC does not issue SGT a Task Order for the EURAFSWA project"). The Navy responded by rejecting Siemens' request (gov't mot. attach. 2 at 1) ("Regarding the requested assurance for recovery of costs, our position, consistent with the DOE IDIQ, is that the Navy will not be responsible for any relevant costs incurred unless a subsequent task order is awarded."). The draft IGA work performed by Siemens was project development work that is not reimbursable absent the award of a task order (R4, tab 10 at GOV358). Additionally, the notice of intent to award, and each of the four modifications, included language clearly stating that the government would not be liable for Siemens' proposal development costs in the event that a task order was not issued for the project (R4 tab14 at GOV495, tab 22 at GOV674, tab 23 at GOV675, tab 24 at GOV677, tab 27 at GOV692).

### III.    The Government Is Entitled to Summary Judgement in Its Favor

Siemens' complaint asserts three counts:  (1) a breach of the duty of good faith and fair dealing; (2) superior knowledge; and, (3) *quantum meruit*.[3] Siemens' complaint, like its claims, asserts contractual remedies based upon actions purportedly in violation of its rights pursuant to the task orders (compl. ¶¶ 8-9 (asserting Board jurisdiction pursuant to the task order)). The government moved for summary judgment with regard to Counts I and II of Siemens' complaint, and to dismiss, or alternatively for summary judgment, with regard to Count III. The government's main argument is that there is no contract between the Navy and Siemens regarding the projects that were not part of the task orders. The Navy notes that Siemens is complaining about pre-award actions, and the duty of good faith and fair dealing, and superior knowledge, do not apply to pre-award actions (gov't mot. at 32, 41). Additionally, the Navy asserts that Siemens is asserting an implied-in-law contract, which the Board is without jurisdiction to entertain (*id.* at 45-46).

---

[3] To the extent Siemens' claims assert an abuse of discretion by the contracting officer for not awarding bid preparation costs pursuant to the discretion granted by the DOE master IDIQ contract, Siemens has not asserted that argument in this appeal, and it is waived.

In response to the government's motion, Siemens now asserts entitlement to the costs of its preparation of the preliminary assessment based, not on the terms of its contract with the Navy, but based upon an implied-in-fact contract. According to Siemens, the duty of good faith and fair dealing, and superior knowledge, apply to the implied-in-fact contract, and that it is asserting an implied-in-fact contract in its *quantum meruit* claim, and not an implied-in-law contract (app. resp. at 23, 36).

## A. Breach of the Duty of Good Faith and Fair Dealing

Siemens asserts that the Navy breached its duty of good faith and fair dealing by "withholding its knowledge of relevant information it had a duty to disclose timely to SGT, causing SGT to incur unnecessary costs to prepare PAs and IGAs for ESPCs-ECMs that were inherently non-viable" (app. resp. at 20). Notably, the preparation of the preliminary assessments and preliminary investment grade audits all occurred *prior* to Siemens submitting its final investment grade audit (the offer), and before the government accepted Siemens' offer and issued a task order (the contract). Siemens never submitted a final investment grade audit (offer) for either Camp Lemonnier or Souda Bay (Magro Decl. ¶ 3).

In its motion, the Navy argues, correctly, that it is well established that the duty of good faith and fair dealing applies to government conduct during the performance of the contract, and does not apply to government actions during the formation of the contract. *See, e.g., Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012) (holding that the government "could not have breached the covenant of good faith and fair dealing by its pre-award conduct because the covenant did not exist until the contract was signed"); *Tug Hill Constr., Inc.*, ASBCA No. 57825, 14-1 BCA ¶ 35,777 at 175,024 *aff'd* 622 Fed. Appx. 914 (Fed. Cir. 2015) (nonprecedential); *Chugach Fed. Solutions*, ASBCA No. 61320, 20-1 BCA ¶ 37,617 at 182,596.

In response, Siemens contends that it is not asserting a breach of the duty of good faith and fair dealing with regard to the issued task order, but rather, with regard to an implied-in-fact contract between the Navy and Siemens (app. resp. at 20). According to Siemens, the Navy's solicitation and receipt of Siemens' proposal created an implied-in-fact contract with the Navy to fairly and honestly consider its proposal (*id.*). Siemens contends that the Navy breached this implied-in-fact contract "negligently soliciting non-viable work in its RPA and TO RFP and failing to provide critical information to SGT as required under the ESPC partnership" (*id.* at 23). In fact, Siemens asserts, its claim is for "recovery of what are essentially bid preparation costs" (*id.*). For its part, the Navy does not respond to this argument, other than in a footnote where it characterizes Siemens' argument as "irrelevant" to the Navy's motion (gov't reply at 9 n.5).

The Court of Appeals for the Federal Circuit has held that an implied contract to treat a bidder honestly is not a contract for the procurement of goods, and thus does not fall within the Contract Disputes Act jurisdiction of the Boards of contract appeals. *Coastal Corp. v. United States*, 713 F.2d 728, 730-31 (Fed. Cir. 1983). Siemens cites to the Board's holding in *Fil-Coil Co.,* ASBCA No. 27347, 83-1 BCA ¶ 16,255 for the proposition that the Board can entertain an implied-in-fact contract for bid costs; however, that decision was issued prior to the Federal Circuit's holding in *Coastal*, and is no longer good law on that point.

Siemens additionally cites to *Safeguard Base Operations, LLC. v. United States*, 989 F.3d 1326, 1342 (Fed. Cir. 2021) for the proposition that the Board can entertain a claim for an implied-in-fact contract for bid preparation costs (app. resp. at 20-21). In *Safeguard* the Federal Circuit considered whether the Court of Federal Claims retained jurisdiction to consider implied-in-fact contract contracts in the bid protest context, following passage of the Administrative Dispute Resolution Act (ADRA) of 1996. *Safeguard*, 989 F.3d at 1342. Unlike the Boards of Contract Appeals, the Court of Federal Claims possesses jurisdiction to entertain contract claims, and bid protest actions, pursuant to the Tucker Act, 28 U.S.C. § 1491. Significantly, the court's Tucker Act contract dispute jurisdiction is not limited to CDA procurement contracts, but extends to "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The question in *Safeguard* was whether the Court of Federal Claims retained jurisdiction to entertain an implied-in-fact contract to consider bids fairly pursuant to its jurisdictional grant to entertain "any" contract pursuant to 28 U.S.C. § 1491(a)(1), after the ADRA gave the court express jurisdiction to entertain bid protests pursuant to 28 U.S.C. § 1491(b). The Federal Circuit held that the Court of Federal Claims possessed jurisdiction solely pursuant to its bid protest authority § 1491(b)(1), and not its contract claim jurisdiction § 1491(a)(1). Thus, the court's holding in *Safeguard* actually confirms that the Board lacks jurisdiction to entertain Siemens' allegation of an implied-in-fact contract to consider its offer, as the Board is entirely without jurisdiction to entertain bid protest actions. *See, e.g. Coastal Corp.*, 713 F.2d at 730.

Siemens also cites to *Prineville Sawmill Co. v. United States,* 859 F.2d 905 (Fed. Cir. 1988), a case that predates the ADRA jurisdictional changes addressed in *Safeguard*, as providing that "an offeror may rely on the remedial power at the Court of Federal Claims or the Boards for recovery of its bid preparation costs" (app. resp. at 28). *Prineville Sawmill* does provide that the Court of Federal Claims possesses jurisdiction pursuant to its "explicit grant of remedial power . . . in bid protest actions." *Prineville Sawmill,* 859 F.2d at 909. However, the Board is without bid protest jurisdiction and does not possess jurisdiction to award bid preparation costs.

Siemens next alleges that the Board possesses jurisdiction to entertain its claim because the Navy awarded a task order to it for some of the sites contained in the

initial request for a preliminary assessment (app. resp. at 38-40). According to Siemens, the Navy's pre-contractual actions can result in breach of duty of good faith and fair dealing in the issued task orders, so long as there is a "tether" linking the pre-contract actions to the asserted post-contract violations of the duty (*id.* at 38). Here, Siemens misreads the holding of decisions such as *N. Am. Landscaping*, ASBCA 60235 *et al.*, 18-1 BCA ¶ 37,116 and *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019). These opinions, and others cited by Siemens, involved post-contractual violations of the duty of good faith and fair dealing, where the court or Board looked to parol evidence of pre-award actions in order to interpret the government's duties pursuant to the contract.

First, we note that Siemens cites to the minority opinion of Judge Clarke in *N. Am. Landscaping*. The majority opinion, by Vice Chairman Prouty, and joined by Acting Chairman Shackleford, found no breach of the duty of good faith and fair dealing. *N. Am. Landscaping*, 18-1 BCA ¶ 37,116 at 180,658. However, even Judge Clarke's minority opinion, which is not Board precedent, notes that "the government's pre-award actions cannot violate the implied duty of good faith and fair dealing because the implied duty does not arise before the contract is awarded." *Id.* ¶ 180,648. Judge Clarke explained that the opinion "discuss[es] the [government's] pre-award actions because they are relevant to the [government's] breach of the implied duty of good faith and fair dealing after award" (*id.*).

In *Dobyns*, the Federal Circuit reviewed a Court of Federal Claims decision finding a breach of the duty of good faith and fair dealing. In the underlying case, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) had entered into a settlement agreement with an undercover agent, regarding allegations that the ATF had not provided adequate support to Dobyns and his family to protect their identities, following Dobyns' undercover actions infiltrating the Hells Angels Motorcycle Club. *Dobyns*, 915 F.3d at 736. Dobyns asserted a breach of the settlement agreement regarding the ATF's actions following "an act of arson" at Dobyns' home. *Id.* On appeal, the Federal Circuit overturned the Court of Federal Claims' holding that there was a breach of the duty of good faith and fair dealing. The court looked to pre-award actions to interpret the scope of the agency's commitment to the agent to provide protection, but noted that the duty of good faith and fair dealing "must be 'keyed to the obligations and opportunities established in the contract,' so as to not fundamentally alter the parties' intended allocation of burdens and benefits associated with the contract." *Dobyns*, 915 F.3d at 739 (citations omitted). The court also explained that "parol evidence may be useful to determine party expectations relating to particular contract provisions, it cannot be the source of an additional duty." *Id.* at 740 n.3.

In this appeal, it is clear that the parties' "intended allocation of burdens and benefits associated with the contract" was that the government would not be liable to compensate Siemens for costs incurred on projects that did not result in a task order.

16

This was clear from the plain language of the contract (R4, tab 10 at GOV354, 358). Siemens was certainly aware of this provision, because it asked the Navy for assurances that it would be compensated for its work if no task order resulted from the evaluation (gov't mot. attach. 1 at 1-2) and the Navy expressly declined to make such an assurance (gov't mot. attach. 2 at 1). Additionally, the notice of intent to award disclaimed any liability for preparatory costs (R4, tab 14 at GOV495). The implied duty of good faith and fair dealing cannot form the basis for new contractual terms, especially when the terms would be inconsistent with the terms of an express contract. *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).

To the extent Siemens is alleging that its Souda Bay costs can be recovered through the issued task order, since they were part of the NOITA, such recovery is precluded by the fact that the claimed costs were development costs and were not included in negotiations or the final awarded Task Order for work at Naples, Sigonella and Rota (Magro decl. ¶ 4), as required by the master contract (R4, tab 10 at GOV361). Additionally, we do not find Siemens' citation to parol evidence regarding the policies of other agencies regarding payment for IGA costs, or the interpretation contained in a utility working group PowerPoint presentation, to be relevant to our interpretation of the contractual language (app. resp. at 34-35).

Having concluded that Siemens has not asserted an implied-in-fact contact within the jurisdiction of the Board, we need not reach the Navy's argument that an implied-in-fact contract was not first presented to the contracting officer for a final decision (gov't reply at 4) or that Siemens failed to establish the elements of an implied-in-fact contract (gov't reply at 5-9).

**B. Superior Knowledge**

The doctrine of superior knowledge generally applies when:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

17

*Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 2004) (quoting *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981)). As was the case with Siemens' good faith and fair dealing argument, the doctrine of superior knowledge also applies only to performance of the contract. In fact, the court in *Hercules* noted that "the cases cited for the superior knowledge doctrine concern the withholding of superior knowledge that makes it more difficult to perform under the terms *of the contract at issue*." *Hercules*, 24 F.3d at 197 (emphasis added). At issue in *Hercules* was the contractor's claims for post-performance settlement and litigation expenses which were denied under the superior knowledge doctrine because "those expenses were not incurred during the performance of the underlying contracts." *Id*. Similarly, Siemens contends that its superior knowledge claim is valid because the costs it incurred at the cancelled locations increased its costs of performance of the task order (app. resp. at 42-43). However, despite the fact that the Souda Bay expenses were part of the same preliminary assessment as Naples, Rota, and Sigonella, the task order clearly provides that it is limited to Naples, Rota, and Sigonella, and that "[t]he agency will not be liable for any costs associated with PA audits or preparation of the PA unless the project addressed by the PA later becomes a TO award" (R4, tab 10 at GOV354). The Camp Lemonnier and Souda Bay preliminary assessments and initial investment grade audit work did not become part of a task order award (Magro decl. ¶ 4), were not performance of the contract at issue, and cannot be the subject of a superior knowledge claim.

### C. Quantum Meruit

In its complaint, Siemens asserts the entitlement pursuant to *quantum meruit* based upon a contract implied-in-fact (compl. ¶¶ 60-62). In its motion, the government asserts that Siemens is actually asserting a contract implied-in-law, beyond the jurisdiction of the Board (gov't mot. at 45-47), and that, to the extent Siemens is actually asserting an implied-in-fact contract, that Siemens cannot establish the existence of such a contract (gov't mot. at 47-48). In response, Siemens cites to the Board's holding in *Honeywell Int'l, Inc.*, ASBCA No. 57779, 15-1 BCA ¶ 36,121, another appeal involving an energy saving performance contract, as providing for recovery pursuant to *quantum meruit* (app. resp. at 36-37).

The Board possesses jurisdiction to entertain *quantum meruit* claims asserting an implied-in-fact contract, where conforming goods or services were accepted by the government, before a contract was rescinded. *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986). *Honeywell* falls squarely within the precedent set by *Amdahl*. In *Honeywell*, the government issued a delivery order for ESPC work at Fort Dix, New Jersey, that included, *inter alia*, solar arrays. The government accepted, and paid for the solar array constructed in phase I of the delivery order, but subsequently determined that the portion of the contract pertaining to solar arrays violated various government statutes not relevant here, and refused to inspect or accept

18

the phase II solar array after Honeywell had completed its construction. Honeywell filed a claim, which was denied by the contracting officer, asserting that the portion of the contact pertaining to the solar arrays was "voidable." *Honeywell*, 15-1 BCA ¶ 36,121 at 176,338-39. The Board then found the existence of an implied-in-fact contract based on the value of the solar array to the government. *Id.* at 176,341. Thus, the Board possesses jurisdiction to entertain *quantum meruit* claims pursuant to implied-in-fact contracts, and we deny the government's motion to dismiss Count III of Siemens' complaint.

However, the appeal before the Board differs in multiple respects from *Honeywell*. As an initial matter, Siemens does not allege that the contract between it and the Navy was void. In fact, the existing written contract specifically disclaims compensation for Siemens for the preliminary work it performed. In addition, unlike in *Honeywell*, Siemens did not actually install any energy saving equipment that would benefit the government. Siemens contends that the government benefited from the preliminary assessment work; however, it is clear that the task order would compensate Siemens only from the energy savings, of which there were none at the Souda Bay and Camp Lemonnier locations. As discussed extensively above, there was no implied-in-fact contract to consider Siemens' bid. Additionally, there can be no implied-in-fact contract covering the same subject matter as an express contract. *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here the express DOE master contract specifically disclaims any right to recovery for PA costs for locations that were not made part of the task order, as did the notice of intent to award a task order and all four modifications to the notice of intent to award (R4, tab 10 at GOV354, 358; tab14 at GOV495; tab 22 at GOV674; tab 23 at GOV675; tab 24 at GOV677; tab 27 at GOV692). Thus, the express DOE master contract precludes the existence of an implied-in-fact contract for the PA costs at Souda Bay and Camp Lemonnier. We see no possible basis for an implied-in-fact contract between Siemens and the Navy regarding Siemens' preliminary assessment costs at Souda Bay and Camp Lemonnier, and Siemens has not established the existence of such a contract.[4] *See also, Eng'r Solutions and Products, LLC*, ASBCA No. 58633, 17-1 BCA ¶ 36,822 at 179,470 (holding "that there was no contract between ESP and the Army, express or implied-in-fact, that would serve as a basis for recovery under *quantum meruit*.")

---

[4] Siemens has not alleged a breach of the DOE master contract, either through a breach of the duty of good faith and fair dealing, superior knowledge, or *quantum meruit*. This Board would be without jurisdiction to entertain such a claim against the Department of Energy, and we make no findings regarding such a claim.

<u>CONCLUSION</u>

For the reasons stated above, the appeals are denied.

Dated: May 24, 2022

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62601, 62602, Appeals of Siemens Government Technologies, Inc., rendered in conformance with the Board's Charter.

Dated: May 24, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

20